772 F.2d 922
 249 U.S.App.D.C. 4, 227 U.S.P.Q. 203,
1985 Copr.L.Dec. P 25,832
 The NATIONAL ASSOCIATION OF BROADCASTERS, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent,
Multimedia Entertainment, Inc., Old-Time Gospel Hour, Motion
Picture Association of America, Inc., et al.,
Superstation, Inc., Intervenors.
The CHRISTIAN BROADCASTING NETWORK, INC., Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent,
Turner Broadcasting System, Inc., Multimedia Entertainment,
Inc., Old-Time Gospel Hour, Inc., Canadian Broadcasting
Corporation, et al., Motion Picture Association of America,
Inc., et al., National Association of Broadcasters, Intervenors.
 Nos. 84-1230, 84-1232 to 84-1234, 84-1238, 84-1396, 84-1398
to 84-1401, 84-1519, 84-1525, 84-1526, 84-1529 to
84-1531 and 84-1535.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 6, 1985.
Decided Aug. 30, 1985.
 
 Petitions For Review of an Order of the Copyright Royalty tribunal.
 Victor E. Ferrall, Jr., Washington, D.C., with whom John I. Stewart, Jr., David H. Solomon, Henry L. Baumann and Michael D. Berg, Washington, D.C., were on brief for petitioner/intervenor, Nat. Ass'n of Broadcasters, in Nos. 84-1230, et al.
 W. Thad Adams, III, Charlotte, N.C., with whom John H. Midlen, Jr., Washington, D.C., was on joint brief for petitioners/intervenors, PTL Television Network and Old Time Gospel Hour, in Nos. 84-1230, et al.
 Arthur Scheiner, Washington, D.C., with whom Dennis Lane and Richard H. Waysdorf, Washington, D.C., were on brief for petitioners/intervenors, Motion Picture Ass'n of America, Inc., et al., in Nos. 84-1230, et al.
 I. Fred Koenigsberg, New York City, with whom Bernard Korman, New York City, for American Soc. of Composers, Authors and Publishers, et al. and Charles T. Duncan, Michael W. Faber, Lisa Holland Powell, Washington, D.C., for Broadcast Music, Inc., were on joint brief, for petitioners/intervenors, music claimants, in Nos. 84-1230, et al.
 Grover C. Cooper, Clifford M. Harrington and Barry Gottfried, Washington, D.C., were on brief for petitioner/intervenor, The Christian Broadcasting Network, Inc., in Nos. 84-1230, et al.
 David H. Lloyd, Robert Alan Garrett, Washington, D.C., for Major League Baseball; Philip R. Hochberg, Washington, D.C., for Nat. Basketball Ass'n, et al. and Judith Jurin Semo, Washington, D.C., for Nat. Collegiate Athletic Ass'n were on joint brief for petitioners/intervenors, joint sports claimants, in Nos. 84-1230, et al.
 Gene A. Bechtel, Lawrence A. Horn and Jacqueline Weiss, Washington, D.C., were on brief for petitioner/intervenor, Public Broadcasting Service, in Nos. 84-1230, et al. and Nos. 84-1519, et al.
 Clifford M. Harrington, Washington, D.C., with whom Grover C. Cooper and Barry H. Gottfried, Washington, D.C., for The Christian Broadcasting Network, Inc. and W. Thad Adams, III, Charlotte, N.C., and John H. Midlen, Washington, D.C., for PTL Television Network and Old-Time Gospel Hour were on the joint brief for petitioners/intervenors in Nos. 84-1519, et al.
 Arnold P. Lutzker, Washington, D.C., with whom Carolyn A. Wimbly, Washington, D.C., were on briefs for intervenor, Multimedia Entertainment, Inc., in Nos. 84-1230, et al. and Nos. 84-1519, et al.
 Dennis Lane, Washington, D.C., with whom Arthur Scheiner, Robert A. Garrett, Jamie S. Gorelick, Charles T. Duncan, Michael W. Faber, Washington, D.C., and Bernard Korman, New York City, were on joint brief for petitioners/intervenors, Motion Picture Ass'n, Inc., et al.
 Douglas G. Thompson, Jr., Washington, D.C., was on brief for petitioners/intervenors, Canadian Broadcasting Corp., et al., in Nos. 84-1519, et al. and Nos. 84-1230, et al.
 William G. Cole, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., and John F. Cordes, Atty., Dept. of Justice, Washington, D.C., were on brief for respondent, Copyright Royalty Tribunal, in Nos. 84-1230, et al. Mark W. Pennak and William Kanter, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondent, Copyright Royalty Tribunal, in Nos. 84-1230, et al.
 Marilyn S.G. Urwitz, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., and William Kanter, Atty., Dept. of Justice, Washington, D.C., were on brief for respondent, Copyright Royalty Tribunal, in Nos. 84-1519, et al.
 Jamie S. Gorelick, Washington, D.C., was on brief for intervenor/petitioner, Nat. Public Radio, in Nos. 84-1230, et al.
 Peter H. Feinberg, Washington, D.C., entered an appearance for intervenor, Superstation, Inc., in Nos. 84-1230, et al. and intervenor, Turner Broadcasting System, Inc., in Nos. 84-1519, et al.
 Victor E. Ferrall, Jr., John I. Stewart, David H. Solomon, Henry L. Baumann and Michael D. Berg, Washington, D.C., entered appearances for intervenor, Nat. Ass'n of Broadcasters, in Nos. 84-1519, et al.
 Meredith S. Senter, Jr., and Edwina E. Dowell, Washington, D.C., entered appearances for intervenor, SIN, Inc., in Nos. 84-1519, et al.
 Before EDWARDS, SCALIA and STARR, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STARR.
 STARR, Circuit Judge:
 
 
 1
 These two cases--one consisting of ten consolidated petitions for review, National Ass'n of Broadcasters v. Copyright Royalty Tribunal, C.A. Nos. 84-1230 et al., the other of seven consolidated petitions, Christian Broadcasting Network, Inc. v. Copyright Royalty Tribunal, C.A. Nos. 84-1519 et al.[1] --return us once again to the increasingly familiar terrain of copyright royalty awards made by the Copyright Royalty Tribunal ("CRT" or "Tribunal"), a government entity established by the 1976 Copyright Act, 17 U.S.C. Secs. 101-810 (1982). These cases represent the court's third foray in as many years into this hotly contested territory, characterized by lively competition for the ever increasing annual cache of royalty dollars for cable retransmission of copyrighted programs. For the reasons that follow, we uphold the decisions under challenge and accordingly deny the petitions for review.
 
 I. BACKGROUND
 
 2
 In view of our two prior decisions in appeals from royalty-distribution determinations by the Tribunal, see National Ass'n of Broadcasters (NAB) v. CRT, 675 F.2d 367 (D.C.Cir.1982) (reviewing the Tribunal's first distribution determination, for calendar year 1978); Christian Broadcasting Network, Inc. (CBN) v. CRT, 720 F.2d 1295 (D.C.Cir.1983) (reviewing the CRT's second annual distribution, for calendar year 1979), it would serve little purpose to rehearse in detail the history of the establishment and operation of the Tribunal and the Royalty Fund. Suffice it to say that in determining the manner in which owners of copyrighted programs would be compensated for cable retransmission of their programming, Congress elected to require cable operators periodically to pay royalties into a central fund, from which the Tribunal distributes the allocated amounts to copyright owners-claimants in annual proceedings. The Copyright Act contemplates that claimants may settle their respective claims,[2] but in each of the first five distributions to date a controversy has emerged requiring CRT resolution. With these consolidated cases, four of those five distributions have been appealed to this court.
 
 
 3
 At the outset, we observe what is common ground among the parties, namely that the nature of our review of CRT decisions is quite limited. A royalty determination is scarcely a typical agency adjudication. When claimants cannot agree among themselves on the appropriate distribution of the fund, they present their cases to the CRT, which resolves the dispute. Any particular royalty percentage established by the Tribunal is, moreover, doomed to be somewhat artificial; that is, it may well appear that it would have been as reasonable for the Tribunal to have fixed the percentage a little higher or a little lower. As we have previously suggested, mathematical exactitude in these matters appears well nigh impossible, NAB v. CRT, supra, 675 F.2d at 373; rough justice in dividing up the royalty pie seems to be the inevitable result of the process that Congress ordained.
 
 
 4
 In reviewing the Tribunal's determinations, the judicial task is not to weigh the evidence and fix what in our view would constitute appropriate percentages, for that would be to intrude into the function entrusted to the Tribunal. Our job, rather, is to determine whether the royalty awards are within a "zone of reasonablenesss"--not unreasonably high or unreasonably low--and that the CRT's decision is neither arbitrary nor capricious, and is supported by substantial evidence. NAB v. CRT, supra, 675 F.2d at 371, 374-75.[3]
 
 II. APPEALS FROM 1979 PROCEEDINGS
 
 5
 As with the Tribunal's first allocation (for calendar year 1978), much of the Tribunal's 1979 allocation was appealed to this court in CBN v. CRT, supra, 720 F.2d 1295. The CRT's allocation was upheld in all but three respects, namely, the Tribunal's decision to award no portion of the Royalty Fund to three separate groups of claimants: (1) the Devotional Claimants,[4] (2) commercial radio broadcasters, and (3) television broadcasters for their contribution to the quality of sports telecasts. On remand, the CRT reconsidered those three non-awards. The Tribunal reaffirmed its decision to award nothing to commercial radio broadcasters and to television broadcasters for the latter's contribution to sports telecasts; however, the Tribunal altered the Devotionals' zero award so as to grant them 0.35% of the total Royalty Fund. The award to the Devotionals and the reaffirmed non-award to commercial radio are now before us.
 
 A. The Devotional Claimants' Award
 
 6
 The Devotionals contend that the record evidence demonstrates that their award should have been much higher than a measly 0.35%; in contrast, several petitioners, including the Motion Picture Association of America ("MPAA") and the Public Broadcasting Service ("PBS"), claim that the Tribunal did not have before it evidence to support any award to this group of claimants. In the view of these challengers, the Tribunal was correct the first time around in awarding nothing to the Devotionals. Next, moving beyond the debate over zero versus something, both the Devotionals and their opponents join, albeit from quite different perspectives, in the claim that the Tribunal gave no indication as to how it arrived at the figure of 0.35%. Hence, the Tribunal is attacked from all sides for having, in effect, pulled a number out of the air.
 
 
 7
 In CBN v. CRT, supra, we identified several specific arguments and pieces of evidence that the CRT failed to address in making its non-award to the Devotional Claimants, thus rendering its decision arbitrary. 720 F.2d at 1309-12. On remand, the Tribunal addressed each of these points, and, as we will demonstrate, adequately responded to them.
 
 
 8
 (1)
 
 
 9
 First, we criticized the Tribunal for having failed to analyze the possible benefits that cable operators might enjoy by carrying the Devotionals' programs. In establishing appropriate royalty percentages, the CRT considered as a major criterion the benefit of the programming to cable systems, yet the Tribunal had not even discussed this criterion in reaching its 1979 decision on the Devotionals. We stated that evidence of record did exist, that the CRT was obliged to address, of benefit to cable systems. Id. at 1310.
 
 
 10
 On remand, the Tribunal stated that "some evidence" supported the proposition that devotional programming was of benefit to cable systems, but that "none of this evidence, in our view, significantly bolsters the devotional claims on the benefit standard, or can remotely be deemed similar to that which we have found to be supportive of the case of sports claimants."[5] 49 Fed.Reg. 20,049, J.A. at 2210 (footnote omitted). The CRT thus concluded that the record did not support a finding that cable operators welcomed the inclusion of devotional programs on distant signals to balance the carriage of non-religious programs. Id.
 
 
 11
 The Devotionals now claim that CRT's decision in this respect is conclusory, totally devoid of analysis as to why the Devotionals' evidence did not prove benefit. We disagree. In support of its conclusion, the CRT relied upon the analysis of the Devotional Claimants' evidence set forth in the Settling Parties' Proposed Findings at 28-29, J.A. at 2289-90.[6] That analysis constituted a responsive critique to the evidence this court had identified as meriting the CRT's consideration and discussion on remand, see 720 F.2d at 1310. The Settling Parties' analysis concluded that, for various reasons, the Devotionals' evidence was, in the first instance, weak and in any event was directly contradicted by evidence introduced by other parties. While one could reasonably disagree with the Settling Parties' analysis, as the Devotionals fervently do, the Tribunal could reasonably invoke that analysis of the evidence adduced by the Devotional Claimants.
 
 
 12
 (2)
 
 
 13
 We also indicated in our prior decision that the Tribunal had failed to provide an adequate justification for treating the Devotionals' claims in a manner different from that accorded the claim of PBS. Id. On remand, the CRT elaborated on its reasons for this difference in treatment:
 
 
 14
 The Devotional Claimants present only a single program while public broadcasting offers a range of programs, that in its diversity attracts a broad range of audience. The carriage of the public broadcasting signals indicates the appeal of their programing [sic]. Devotional programmming [sic] is but a small portion of a distant signal. Therefore, the carriage of that signal does not establish the appeal of devotional programming.
 
 
 15
 49 Fed.Reg. 20,050, J.A. at 2211. That is to say, inasmuch as a PBS station carries only PBS programming, the Tribunal concluded that a cable operator's decision to carry a PBS station reflects a judgment that PBS programming is of value. On the other hand, the decision to carry a station that carries one or more programs of the Devotional Claimants does not necessarily represent a determination by the cable operator that it was the devotional portion of that station's programming which was deemed valuable. Since the vast majority of that station's programming would be non-devotional, the Tribunal could reasonably conclude that it is more likely that the station was being carried by the cable operator because of its other, nondevotional shows.[7]
 
 
 16
 (3)
 
 
 17
 In the 1979 proceeding, the Devotionals had claimed that because of the retransmission of local stations carrying their programming, cable operators were less likely to carry the satellite networks of CBN and PTL. The upshot of this, the Devotionals contended, was less viewing of Devotional programming and fewer contributions to the Devotional Claimants than would otherwise obtain. The CRT had initially ruled that such a loss was not compensable; on review, however, this court held that if the Devotional Claimants could prove "that cable retransmission has measurably diminished their ability to exploit the contribution potential of their particular works, whether by satellite or otherwise," they could be compensated for such losses. 720 F.2d at 1312. At the same time, however, we noted that "proving such an attenuated loss would be extremely difficult." Id. Because the Tribunal had not even considered the Devotionals' evidence on this claim, we remanded the issue.
 
 
 18
 On remand, the Tribunal concluded that no evidence in the 1979 record supported an award for harm to CBN's and PTL's satellite networks. 49 Fed.Reg. 20,050, J.A. at 2211. The Devotionals attack this finding, arguing that they did in fact come forward with evidence to support their claim, and that the CRT was obliged--but failed--to address this evidence in detail. A review of the Devotionals' evidence, J.A. at 2242-46, however, demonstrates that it does not mandate the Tribunal's grant of an award on this ground. The evidence consists entirely of anecdotes and theories about how contributions from viewers might be diminished by cable retransmission.[8] There was no attempt by the Devotionals to provide any estimate as to the amount of losses they were experiencing. Our prior opinion made it clear, as we have seen, that the Devotional Claimants had to prove that their contributions had "measurably diminished," and that this would be "extremely difficult" to demonstrate, 720 F.2d at 1312. Our examination of the Devotionals' evidence on remand persuades us that the Tribunal was justified in concluding that the Devotionals lacked probative evidence to support their claim.[9]
 
 
 19
 (4)
 
 
 20
 Finally, we remanded to the CRT on two other issues. First, the Tribunal had initially held that a "fundamental distinction" existed between the Devotional Claimants and all other claimants, in that the Devotional Claimants purchase air time to carry their programs. This commercial fact of life was deemed of some considerable significance; indeed, the CRT had previously deduced from this "distinction" that devotional programming enjoyed no market value. Second, the Tribunal had previously held that the Devotional Claimants may well benefit (receive a "negative harm") from cable retransmission by increasing financial contributions from an expanded universe of viewers. This fact was considered highly important since gifts and contributions from viewers constituted the paramount source of the Devotional Claimants' funds. We remanded these two issues inasmuch as the Tribunal had failed to take into account possible weaknesses in its conclusions and had failed to respond to the Devotional Claimants' arguments on these issues. 720 F.2d at 1309-11.
 
 
 21
 On remand, the Tribunal stated that it remained wedded to the view that the evidence adduced was consistent with its original conclusions with respect to the "fundamental distinction" and "negative harm" factors, but that the Tribunal had, in essence, decided not to rely upon those factors in making an award. MPAA and the other claimants opposing the Devotionals' award (and, curiously, the Devotional Claimants themselves) now contend that this decision was irrational; they argue that if the Tribunal concluded that the evidence supported findings of a "fundamental distinction" and "negative harm," then the CRT had to weigh those factors against any possible award to the Devotionals.
 
 
 22
 We disagree. It was clear from our prior decision remanding the Devotionals' non-award that we did not find convincing the evidence supporting the "fundamental distinction" or "negative harm" theories. We now read the CRT's decision on remand as stating that, while the Tribunal still deemed the theories of a "fundamental distinction" and "negative harm" to be plausible, the evidence of record was not strong enough to overcome this court's criticism of those theories and thus could not justify the total denial of an award to the Devotional Claimants. The CRT on remand did not rely upon those theories, but merely stated that the evidence was "consistent with" a "fundamental distinction," and that under a "negative harm" theory, the Devotional Claimants "may not sustain a net loss." 49 Fed.Reg. at 20,050, J.A. at 2211. The Tribunal also stated that if evidentiary hearings were conducted in subsequent distribution proceedings, the Tribunal expected the parties to make a fuller record on those issues, id., again indicating that the evidence in the 1979 proceeding was deemed insufficient. Given this court's clearly articulated wariness of the "fundamental distinction" and "negative harm" theories in the prior proceedings, we will not at this late date replough old ground and fault the Tribunal's decision in this respect.
 
 
 23
 (5)
 
 
 24
 In sum, we are persuaded that the Tribunal adequately addressed the issues on which we remanded its prior decisions denying any award to the Devotional Claimants. Nonetheless, both the Devotional Claimants and their opponents argue that the actual award of 0.35% was arbitrary and capricious. The Devotional Claimants contend that since Nielsen viewing data indicated that devotional programming comprised 5% of all distant signal programming in 1979, and enjoyed a 1% viewing rating, the Devotionals' award should have been somewhere between 1% and 5%. On the other hand, MPAA and its allies argue that the Tribunal did not have before it evidence supporting any award, and thus that no award should have been made to the Devotional Claimants. In addition, both the Devotionals and their opponents contend that the Tribunal gave no indication as to how it arrived at 0.35%.
 
 
 25
 While we agree that the Tribunal's decision does not expressly articulate the precise manner in which it arrived at the figure of 0.35%, the CRT's past practices and the mandate of our remand in CBN v. CRT adequately indicate that manner, and satisfactorily demonstrate that the Tribunal's award was squarely within the zone of reasonableness. When this court remanded the 1979 proceedings, we stated that a complete non-award to a copyright holder would be "scrutinize[d] carefully," 720 F.2d at 1305, and that a non-award for programming that received a 1% viewing rating needed more explanation, in view of the Tribunal's position that Nielsen viewing data constituted the single most important genre of evidence. Id. at 1311. The implication of our opinion was clear: a complete non-award to the Devotional Claimants would have to be strongly justified.
 
 
 26
 On remand, when considering for the first time the question whether Devotional programming benefited cable operators, the CRT stated that there was "some evidence" of benefit. 49 Fed.Reg. 20,049, J.A. at 2210. Even though it found this evidence to be weak, the Tribunal obviously concluded that it would be difficult, in the face of this court's prior decision, to grant no award at all under those circumstances. When this over-arching constraint emanating from our prior opinion is coupled with the CRT's general methodology of fixing awards by starting with Nielsen viewing ratings for the programming in question, and then reducing the Nielsen figure for weakness in evidence, see, e.g., 47 Fed.Reg. 9892, J.A. at 38, the Tribunal's method for determining the Devotional Claimants' award becomes clear. Given the CRT's general approach, an award falling somewhere below 1% (due to weakness of evidence) but above 0 (due to the presence of some evidence) was suggested by the evidence of record. Given this analysis, the zone of reasonableness for the Devotionals' award was between 0% and 1%. The Tribunal's award of 0.35% fell comfortably within that zone.[10]B. Commercial Radio
 
 
 27
 Cable systems retransmit the signals of radio stations, in addition to television station signals. Thus, among the hearty band of claimants for the Royalty Fund distributions were and are commercial radio broadcasters. In its original 1979 proceeding, however, the Tribunal held that it could find no significant marketplace value for or benefit from cable retransmission of distant commercial radio stations; in consequence, no award was made to commercial radio broadcasters. 49 Fed.Reg. 9894, J.A. at 40. We remanded this decision because, although we concluded that ample evidence buttressed the Tribunal's conclusion that retransmission of radio broadcasts have little value, the CRT's decision to grant no award to commercial radio broadcasters appeared inconsistent with the Tribunal's decision to give some unspecified award to the Music Claimants for the use of copyrighted music on retransmitted radio signals. 720 F.2d at 1317-18. We directed the Tribunal either to provide an explanation for this difference in treatment between broadcasters and music claimants or to alter its awards.
 
 
 28
 On remand, the Tribunal adhered to its original decision, but explained why it deemed different awards to be warranted. The Tribunal reaffirmed its substantive conclusion that the broadcasters' contributions to radio retransmissions were, in essence, commercially worthless to the cable market, and that any value in the retransmission of commercial radio stations is attributable to the music played on those stations. The broadcasters' contention that their programming formats deserved compensation was, in the CRT's view, a claim for "compilation" applied to radio, 49 Fed.Reg. 20,051, J.A. at 2212, yet the Tribunal had already held in the context of television broadcasts (with this court's approval) that the value of compilations was de minimis. See NAB v. CRT, supra, 675 F.2d at 379; see also part III. B., infra. We find this conclusion--that people listen to retransmitted stations for the music, and thus any award for retransmitted radio broadcasters should go to the Music Claimants--to be reasonable.[11]
 
 III. 1980 PROCEEDINGS
 
 29
 The Tribunal granted the same awards to all claimants for 1980 as it had in 1979. Several issues decided by the Tribunal in the 1980 Distribution Determination have now been appealed: (1) the National Association of Broadcasters and the Canadian Claimants argue that the CRT refused to evaluate their improved evidentiary showing in the 1980 proceedings, and instead changed an award only if evidence demonstrated that circumstances had changed between 1979 and 1980; (2) the NAB, as it has previously, claims that the CRT acted arbitrarily and capriciously when it determined that NAB's "broadcast day compilations" were commercially worthless and deserved no award; (3) the NAB claims that its programs deserve more than the 4.5% awarded by the Tribunal, while MPAA claims that NAB's 4.5% award is too high; and (4) the Devotionals, Commercial Radio, and the Canadian Claimants, each of which received the same award in 1980 as in 1979 (0.35%, 0, and 0.75%, respectively), argue that their awards are unjustifiably low (or non-existent, in Commercial Radio's case).
 
 
 30
 A. "Changed Circumstances"
 
 
 31
 In the 1980 Distribution Determination, the NAB and the Canadian Claimants presented evidence that, in their view, demonstrated, first, that certain conclusions in the 1979 Determination were incorrect, and second, that these claimants deserved higher awards in the 1980 Determination.[12] In the face of that evidence, NAB and the Canadian Claimants (indeed, as we already observed, all claimants) received the same awards in the 1980 Determination as in the prior year. NAB and the Canadian Claimants argue that the reason the CRT reached precisely the same result is that the Tribunal decided to make a different award for 1980 than for 1979 if and only if a claimant could show that circumstances had changed between 1979 and 1980.[13] NAB and the Canadian Claimants maintain that it was arbitrary and capricious for the Tribunal to lock itself into its past judgments and thereby ignore new evidence that might show past decisions to have been infected with error.
 
 
 32
 (1)
 
 
 33
 We agree that, as the parties themselves recognize, it would be improper, as a matter of law, for the Tribunal to rely solely upon a standard of "changed circumstances." The invalidity of this rigid approach is strongly suggested by our two prior opinions, which expressly contemplated that in the annual determination process the claimants would improve upon the quality and sophistication of their evidentiary submissions. At the same time, it is entirely appropriate for the Tribunal to employ, as one of its analytical factors, the determination whether circumstances have changed in the course of the ensuing twelve months, inasmuch as that conclusion will obviously be relevant to the question whether an award should differ from the prior year's award. But if a claimant presents evidence tending to show that past conclusions were incorrect, the Tribunal should either conclude, after evaluation, that the new evidence is unpersuasive or, if the evidence is persuasive and stands unrebutted, adjust the award in accordance with that evidence.
 
 
 34
 The CRT, however, denies having employed an exclusive, "changed circumstances" standard. Upon examining the Tribunal's 1980 Determination, we agree that it did not in fact do so. The Tribunal clearly discussed the new evidence proffered by NAB and the Canadian Claimants. For example, the CRT determined, after analysis, that a new survey submitted by NAB and testimony by two cable operators did not justify a higher award.[14] 48 Fed.Reg. 9565, J.A. at 2203. The Tribunal also analyzed new evidence put on by the Canadian Claimants, but found that evidence unpersuasive. Id. at 9567, J.A. at 2205. The CRT, in addition, discussed and analyzed attempts by other claimants, such as MPAA and associated program suppliers and Multimedia, to improve the quality of their evidence, see 49 Fed.Reg. 9564, 9568, J.A. at 2202, 2206, and criticized the Devotional Claimants for failing even to attempt to adduce better evidence, see id. at 9568, J.A. at 2206 ("Most claimants in the 1980 proceeding sought to improve their presentation in areas where the Tribunal has found gaps or deficiencies. No such undertaking was made by the devotional claimants.").
 
 
 35
 (2)
 
 
 36
 In seeking to demonstrate that the CRT relied solely upon "changed circumstances," NAB and the Canadian Claimants essentially glide over the actual decision of the Tribunal; instead, they rely heavily upon a dissent from the 1980 Determination by Commissioner Burg. In her dissent, Commissioner Burg stated that the
 
 
 37
 basis for the allocations reached by the majority in Phase I was predicated ... on the assumption that the Tribunal was bound by the precedents of its previous decisions, and could not alter those previous allocations unless the facts had materially changed. All evidence therefore had to be viewed through the prism of "changed circumstances."
 
 
 38
 49 Fed.Reg. 9569, J.A. at 2207 (footnote omitted).[15] NAB[16] also points to a letter from Commissioner Brennan, cited by Commissioner Burg in her dissent. There, Commissioner Brennan expressed dissatisfaction with a Phase II award of 1.6% to Multimedia, stating that such an award was inconsistent with the rationale of the Phase I awards. This statement does not mention "changed circumstances" at all, and NAB does not explain why it should be read to support its position. Nonetheless, NAB appears to be saying the following: since all agree that the Multimedia award was not based solely on "changed circumstances," see supra note 13, Commissioner Brennan's statement that the rationale for the Multimedia award was different from the rationale for other awards must mean that, as to the other awards, only a "changed circumstances" standard was applied. Finally, NAB argues that statements made by Commissioner Coulter during the evidentiary presentations in the 1980 proceedings demonstrated that yet another Commissioner believed the Tribunal would be acting arbitrarily and capriciously if, in the absence of "changed circumstances," it granted an award in 1980 differing from that conferred in 1979. See, e.g., J.A. at 2690.
 
 
 39
 We find these arguments unpersuasive. Commissioner Burg's dissent, which was joined by no other Commissioner, obviously did not purport to reflect the Tribunal's views. Her statement simply cannot override the Tribunal's own discussion and analysis of new evidence, see supra pages 932-933. As for Commissioner Brennan's letter, the excerpts cited by Commissioner Burg nowhere mentioned the use, or lack of use, of a "changed circumstances" standard. Commissioner Brennan merely spoke of "the rationale" used in the Phase I determination. He did not describe what he believed that rationale to be or how the rationale for Multimedia was different. Because of this lack of clarity, we cannot conclude that Commissioner Brennan's letter demonstrated that the CRT relied exclusively upon "changed circumstances."
 
 
 40
 Finally, the Tribunal maintains that Commissioner Coulter's comments were in fact questions to the parties before the CRT and did not reflect his personal views. CRT Brief at 39 n. 4. We need not march into that thicket of subjectivity, however, because even if Commissioner Coulter was erroneously of the view at the time evidence was being presented that the Tribunal must look only to "changed circumstances" from the previous year, nothing in the record indicates that Commissioner Coulter adhered to that notion when he participated and concurred in the actual Distribution Determination. Indeed, Commissioner Coulter expressed no disagreement with the CRT's decision as to Multimedia, even though (as we noted above) that decision did not rely solely upon "changed circumstances."
 
 B. Broadcast Day Compilations
 
 41
 In the 1980 proceedings, the NAB renewed its royalty claim based upon the efforts of broadcasters in compiling "broadcast days," that is, "the process by which broadcasters select programs from among diverse alternatives and assemble them with other program elements into a broadcast schedule that is usable by and attractive to viewers." NAB Brief at 18. In the 1978 and 1979 proceedings, the Tribunal determined that broadcast day compilations have no commercial value for cable operators and accordingly granted no award for them. In 1980, NAB presented new evidence on the issue, but the Tribunal reached the same result:
 
 
 42
 We find that broadcast day compilation is of no value to a cable system. We reject the argument of NBA [sic] that it is the broadcast compilation which creates "a station image which is highly promotable by cable operators." Cable systems are interested in the programs on a distant signal which induce persons to subscribe, not in the scheduling and promotion.
 
 
 43
 48 Fed.Reg. 9566, J.A. at 2204.
 
 
 44
 NAB argues that, in order to engage in reasoned decisionmaking, the CRT was obliged to give a more complete explanation of why it rejected NAB's unrebutted evidence. But NAB's evidence, as its own brief shows, consists almost exclusively of statements by NAB members and officers as to how valuable they believe broadcast day compilations to be. NAB Brief at 19-21. The CRT was under no obligation, in order to avoid arbitrariness and caprice, to explain why its view as to the worth of such compilations was unaltered by self-serving statements of the claimant itself.
 
 
 45
 In addition, NAB argues that the Tribunal's award to the Music Claimants for background music in television shows is inconsistent with its non-award for broadcast day compilations, inasmuch as both broadcast day compilations and background music are unobtrusive and unnoticeable to the television viewer. NAB further contends that viewers do not watch television shows or subscribe to cable because of background music; thus, the argument runs, the CRT's decision that no one subscribes to cable television because of broadcast day compilations is not a valid reason for a non-award.
 
 
 46
 These arguments cannot carry the day. Broadcast day compilations and background music are not so similar that the CRT cannot reasonably treat them differently. In the Tribunal's view, background music improves the quality of programs, and thus people are more likely to want to watch those programs even though they may not choose to do so exclusively because of the background music. See 48 Fed.Reg. 9558, J.A. at 2196. On the other hand, the Tribunal has consistently determined, with this court's approval, see NAB v. CRT, supra, 675 F.2d at 379, that broadcast day compilations neither add to the value of programs nor make it more likely that people will wish to watch those programs. These determinations are reasonable and well within the Tribunal's authority.
 
 C. NAB's 4.5% Award
 
 47
 NAB received a 4.5% award for local programs, such as local news and public affairs programming, produced by its member stations and transmitted to nearby (though technically "distant") communities. Decrying its award as unjustifiably low, the NAB points to evidence presented in 1980, especially a new survey of more than 400 cable operators. In that survey, the cable operators ranked on a scale of one to five the value they placed on different types of programming. The survey results, NAB contends, demonstrate that NAB's local programming was quite valuable, thereby warranting a higher award than the paltry 4.5% it received. On the other hand, MPAA argues that the relevant evidence demonstrated that NAB's 4.5% award was too high.
 
 
 48
 We hold that the CRT's decision in this request is within the zone of reasonableness. NAB's new survey may have shown that its programs have value, but this evidence did not demonstrate that value to be greater than 4.5% of the Royalty Fund; as the Tribunal stated, "[w]e have never asserted that station programming is of no value to cable operators, but the value of such programming is adequately compensated in our [4.5%] award to commercial television." 48 Fed.Reg. 9565, J.A. at 2203. Similarly, we are not persuaded by MPAA's argument that new evidence presented at the 1980 proceedings, such as the testimony of two cable operators,[17] is powerful enough to remove the 4.5% award from the zone of reasonableness.
 
 
 49
 D. Devotional Claimants', Commercial Radio's and Canadian Claimants' Awards
 
 
 50
 The Devotionals presented one new piece of evidence in the 1980 proceedings, namely a statement by one cable operator that devotional programming was popular in the South and that his subscribers would be irate if he discontinued devotional programming. CBN Brief at 22. This single new item of evidence, while relevant, is not so persuasive as to require the Tribunal to modify its awards; 0.35% is still within the zone of reasonableness. As for Commercial Radio, their arguments for 1980 are the same as for 1979, so for the reasons stated above, see supra page 931, we find the decision to award nothing to Commercial Radio to be reasonable.
 
 
 51
 The Canadian Claimants argue that new evidence which they presented in the 1980 proceedings required an award exceeding their 1979 level (0.75%). The most important new evidence was aimed at improving the record to correct deficiencies in proof as to how much Canadian programming was carried on American cable systems. Despite this evidence, the Tribunal found that "the record does not reflect any increase in distant signal carriage of Canadian stations on [sic] 1980 over 1979." 48 Fed.Reg. 9567, J.A. at 2205. The Canadian Claimants reply that they were not attempting to show an increase; instead, they believe that their award in 1979 was decreased because of deficiencies in their evidence, and thus, when their evidentiary submission was improved, their award should have been increased. Granting the premise, the conclusion does not follow. The Tribunal noted that "[m]ost claimants in the 1980 proceeding sought to improve their presentation in areas where the Tribunal had found gaps or deficiencies." Id. at 9568, J.A. at 2206. Thus the issue is not whether the Canadians objectively improved the quality of their evidentiary submissions, but rather whether any such improvement was sufficient to warrant an award from the 1980 fund greater than the 1979 award, in light of the submissions made by other claimants. The Tribunal's conclusion that no increase in the Canadians' relative share was justified is sufficiently rational to survive review.
 
 
 52
 The Canadian Claimants also presented new evidence designed to show that their programming appeals to American audiences. This evidence consisted of videotapes of Canadian programming, awards bestowed upon Canadian programs, and testimonial observations as to the uniqueness of Canadian programs. Canadian Claimants Brief at 27-29. The Tribunal, however, evidently decided that commercial sales of Canadian programming in the United States constituted the best evidence as to the appeal of Canadian programming, and that this evidence did not demonstrate any such appeal. 48 Fed.Reg. 9567, J.A. at 2205. The Tribunal acted within its discretion in relying on this more concrete kind of evidence, as opposed to claims of program quality and uniqueness. Finally, we find unpersuasive the Canadian Claimants' arguments that French-language programming has a significant value to American cable systems. All in all, the Tribunal's award was within the zone of reasonableness.
 
 IV. 1982 PROCEEDINGS
 
 53
 For the final phase of our review, three main issues are presented from the 1982 Distribution:[18] (1) whether and to what extent the Tribunal is required to investigate the copyright status of MPAA products; (2) whether the reduced award to Multimedia was proper and supported by substantial evidence; and (3) whether the award to the Devotional Claimants was supported by substantial evidence.
 
 A. MPAA's Copyright Ownership
 
 54
 The Tribunal has never required a claimant to prove copyright ownership as to all of its programs which were retransmitted by cable. To the contrary, the CRT requires by regulation only that a claimant list one program transmitted by cable to which the claimant owns the copyright. 37 C.F.R. Sec. 302.3(d). Thus, MPAA--which each year has captured the lion's share of the fund--has never provided the CRT with a list of the thousands of programs (movies, in the main) for which it has claimed royalties over the years. In CBN v. CRT, supra, the Devotional Claimants argued that this procedure may have allowed MPAA improperly to earn royalties as to works that may have been in the public domain. 720 F.2d at 1313. We held, however, that "there is substantial evidence in the record to support the Tribunal's conclusion that its awards went only to bona fide copyright owners." Id.[19]
 
 
 55
 In the 1982 proceedings, Multimedia presented evidence that eight movies broadcast on cable by WTBS[20] of Atlanta were not protected by copyright. Multimedia argued that this showing (1) raised serious doubts as to the number of programs for which MPAA enjoyed copyrights, and (2) shifted the burden of proof to MPAA to list all programs which it claimed and to prove its copyright ownership of each. The Tribunal disagreed; it found these eight movies to be such a small percentage of the total programming claimed by MPAA as to be de minimis. The Tribunal stated: "[W]e do not intend to burden claimants with a totally unnecessary exercise in paper collection because there may be some public domain films included in the Nielsen Study." 49 Fed.Reg. 37,656-57, J.A. at 79-80.
 
 
 56
 Although we are troubled, as we shall presently elaborate, by the Tribunal's procedures in this respect, we nonetheless uphold the Tribunal on this issue. Importantly, Multimedia did not challenge the CRT's regulation on proving copyright ownership, and it would be inappropriate at this late stage to penalize MPAA for its compliance with the Tribunal's existing regulations. Furthermore, the weakness of Multimedia's evidence, while suggesting flaws in the Tribunal's current procedures, justifies the Tribunal's specific decision in this Distribution Determination. Proof that eight obscure movies[21] shown on one "superstation" may not in fact enjoy copyright protection hardly requires the CRT to wade through the copyright status of thousands of programs. Finally, it appears from the record that Multimedia did not present its evidence until very late in the process, during cross-examination of MPAA's witness. See J.A. at 1417-22. It is unreasonable to ask the Tribunal to engage in (or direct the engaging in) thousands of hours of research at the eleventh hour in an already protracted process.
 
 
 57
 Nevertheless, this matter raises a troublesome point posing potential difficulties for the Tribunal in future proceedings, should a timely challenge be mounted to CRT's regulation in this respect. It may be a reasonable concession to the much bewailed size and staff limitations under which the CRT labors for the Tribunal to presume copyright ownership as long as one valid program supports the claim. But the reasonableness of the Tribunal's regulation is undermined by the lack of a procedure by which an opposing claimant can obtain access to data bearing upon other claimants' copyright ownership. Without knowing what programs are being claimed, an opposing claimant is virtually disabled from mounting an effective challenge on the issue of copyright ownership. If the Tribunal wishes to rest on a presumption of ownership, it should nonetheless provide opposing claimants with some means of obtaining information concerning the copyright status of programs for which other claimants seek royalties. While it is emphatically not our function to mandate any specific procedure in this respect, the Tribunal could, for example, consider requiring that a claimant (as a condition for receiving royalties) place in the record a list of all programs for which it is seeking royalties. Whatever procedure the Tribunal chooses to adopt, the goal to be achieved is for the CRT to establish, consistent with orderly procedures and expeditious proceedings, a sensible way in which a good-faith examination of and challenge to copyright ownership can be effected.
 
 B. Multimedia's Award
 
 58
 Multimedia received a 1% award in the 1982 Determination, down from its 1.6% award in previous years. The reason articulated by the Tribunal for this reduction is that Multimedia's most important program, "Donahue," was no longer carried on WGN-TV--a Chicago "superstation"--but instead on another station which was not carried on nearly as many cable systems. In consequence, "Donahue" had far fewer cable system viewers. The CRT concluded that this development greatly reduced the marketplace value of "Donahue" and its benefit to cable operators; because the value of "Donahue" was so central to Multimedia's awards in previous determinations, a reduction in the award for 1982 was, the Tribunal concluded, justified. 49 Fed.Reg. 37,655, J.A. at 79.
 
 
 59
 Multimedia argues that in previous determinations its award was never increased by virtue of "Donahue" being carried on WGN; as a result, Multimedia contends, it is inconsistent for the CRT now to penalize Multimedia because "Donahue" is no longer on WGN. Multimedia claims that, despite the fact that WGN was carried on ever increasing numbers of cable systems over past years, the CRT never found that the increase in carriage resulted in more harm to Multimedia or an increase in the value of "Donahue" to cable operators.
 
 
 60
 Notwithstanding its superficial appeal, Multimedia's interpretation of the basis for the Tribunal's past awards is simply incorrect. In prior determinations, the Tribunal stated that it was basing Multimedia's award in part on the possible harm to Multimedia arising from the increasing amount of retransmission of WGN on cable systems. See 1980 Distribution Determination, 48 Fed.Reg. 9569, J.A. at 60; 1981 Distribution Determination, 49 Fed.Reg. 7848, J.A. at 66. This very factor was thus taken into account by the Tribunal in arriving at Multimedia's 1.6% award.
 
 
 61
 As for the effect of WGN's carriage on marketplace value, it simply is impossible to conclude how much weight, if any, the Tribunal placed on this factor in earlier proceedings when it evaluated the marketplace value and benefit to cable operators of Multimedia's programming. In its prior decisions, the Tribunal did not state that it was giving Multimedia credit for carriage on WGN, nor did it say it was not giving Multimedia credit. The Tribunal simply said nothing on this point. If Multimedia was of the view that it was not being given fair consideration for the carriage of "Donahue" on WGN, it should have appealed that issue in the earlier proceedings. It did not do so and cannot now be heard to complain of that earlier action by the Tribunal.
 
 
 62
 Inasmuch as we cannot conclude that the Tribunal failed in the past to give credit to Multimedia for the carriage of "Donahue" on WGN, we cannot say that the CRT was inconsistent in the 1982 proceeding when it reduced Multimedia's award based on the absence of carriage on WGN. All we can do is determine whether the Tribunal's decision to lower Multimedia's award based on the change was reasonable. We conclude that it was. "Donahue" was Multimedia's most important program, and its carriage and viewership on cable dropped dramatically between 1981 and 1982. 49 Fed.Reg. 37,655, J.A. at 79. Such a drop obviously demonstrates a reduction in value and supports a Tribunal decision to make a reduced award.[22]
 
 C. Devotional Claimants' Award
 
 63
 The Tribunal increased the Devotional Claimants' award to 1% in the 1982 Determination. The Devotionals complain that this figure is still too low, while virtually all other claimants believe it to be far too high.
 
 
 64
 The Devotional Claimants' major item of new evidence in the 1982 proceedings was a survey of cable subscribers which asked them to list the main reasons they subscribe to cable television. Four percent of the subscriber-respondents listed as one such reason the desire to obtain devotional programming. J.A. at 623. The Tribunal noted that this survey, coupled with other new evidence submitted by the Devotional Claimants, represented an effort by the Devotionals to respond to evidentiary deficiencies identified by the CRT in earlier proceedings. The Tribunal concluded that, while the new evidence was not without flaws, it did demonstrate some value on the part of the devotional programming--enough to justify a 1% award. 49 Fed.Reg. 37,654-55, J.A. at 78-79.
 
 
 65
 We find the Tribunal's decision supported by substantial evidence. The Devotionals' new evidence, while indicative that devotional programming is of some value, is not so strong in our view as to mandate an award greater than one percent. On the other side, MPAA and others argue that the Devotionals' evidence was too flawed to justify any increase in their award, and that other evidence showed the Devotional Claimants' evidence to be commercially worthless. But the Tribunal never claimed that the Devotionals' new evidence was perfect; as for evidence of market worthlessness, MPAA's evidence went mostly to the question of the value of Devotionals' programs to local stations, not to cable operators. We believe the evidence placed the Tribunal's modest increase in the Devotional Claimants' award within the zone of reasonableness.
 
 
 66
 The Devotional Claimants interpose two other objections to the 1982 proceedings. First, they claim that the procedure employed by the Tribunal was in violation of the Copyright Act. In the 1982 proceedings, all claimants except the Devotional Claimants and Multimedia agreed among themselves as to the percentages of the Royalty Fund. The claims of the Devotionals and Multimedia together totalled less than 10%; thus, the Tribunal distributed 90% of the fund to the Settling Parties for distribution as per their agreement. The claims of the Devotionals and Multimedia were then argued before the Tribunal, and the various Settling Parties presented evidence and arguments as to why the Devotionals and Multimedia should receive less than they were asking. The Devotionals argue that the Copyright Act and due process requirements were violated by requiring only the Devotionals and Multimedia to prove their cases. The Devotionals maintain that the Tribunal should not have distributed funds to the Settling Parties unless those parties had proved their entitlement to the percentages agreed upon in the settlement.
 
 
 67
 This argument is without merit. As we previously observed, the Copyright Act anticipates that parties may settle their claims, and that they can receive any part of the fund not in controversy. See supra note 1. We would effectively eliminate the likelihood for settlements if we accepted the Devotionals' contention that when one claimant--no matter how modest that claimant's likely share under even the most sanguine view--chooses not to settle with the other claimants, all awards would thereby be in controversy and a full hearing on all claims would be required. Past history suggests that at least one claimant will in any given proceeding feel sufficiently aggrieved to upset the settlement apple cart. More fundamentally, inasmuch as the Devotionals never claimed any of the 90% of the fund that was distributed to the settling parties, we cannot see in what manner they were harmed by the Tribunal's approach here.
 
 
 68
 Second, the Devotionals maintain that the Tribunal has made a judgment that PBS programming is better and more worthy of support than devotional programming, and that this is partly the reason for PBS's receiving a higher award than the Devotionals. We find no evidence that this is the case. However, we caution the Tribunal that while it may use quality of programming as a factor, see CBN v. CRT, supra, 720 F.2d at 1303, it would not be within its power to distribute royalties on the basis of a view that PBS has some sort of "special place" in broadcasting. The Tribunal should rely, as it has in the past, on marketplace criteria, not on subjective assessments as to the value and importance of one sort of programming as opposed to another.
 
 
 69
 Finally, CBN contends that the Tribunal's decisions over the years evince an unconstitutional hostility toward broadcasting carried on as part of its Christian ministry. We find no evidence that this is so. In the first place, the Tribunal in the 1982 Determination increased the Devotionals' award to 1%, a decision scarcely suggestive of hostility to CBN (or its co-workers in the religious-broadcasting vineyard). Second, the real target of CBN's fire is language in the Tribunal's original 1980 Determination referring to the Devotionals' "Christian Ministry." See CBN Brief at 40-41; 48 Fed.Reg. 9568, J.A. at 2206. But that 1980 Determination was thereafter vacated entirely by this court, at the CRT's request, in the wake of our partial remand of the 1979 Determination. The 1980 Determination now before us contains no language indicating any hostility toward the Devotional Claimants. In a word, we can find no evidence to support the proposition that CBN was not awarded its "fair share" of copyright royalties, CBN Brief at 41, much less that this alleged shortfall resulted from anti-sectarian sentiments harbored by the Tribunal.V. CONCLUSION
 
 
 70
 We have thus concluded this third lengthy expedition into the arena of copyright royalty distributions. We emerge from our analysis of these inherently subjective judgment calls and rough balancing of hotly competing claims with one overriding conclusion: it is the Tribunal which Congress, for better or worse, has entrusted with an unenviable mission of dividing up the booty among copyright holders. Given the potential monetary stakes, the claimants' studied tack to date of "boundless litigiousness." 720 F.2d at 1319, directed at the various nooks and crannies of the Tribunal's decisions is perhaps understandable. But with today's decision joining the ranks of our two prior exercises of review, the broad discretion necessarily conferred upon the Copyright Royalty Tribunal in making its distributions is emphatically clear. We will not hesitate henceforth, should this tack of litigation-to-the-hilt continue to characterize the aftermath of CRT distribution decisions, to refrain from elaborately responding to the myriad of claims and contentions advanced by a highly litigious copyright-owner subculture.
 
 
 71
 Denied.
 
 
 
 [1]
 Citations to briefs and Joint Appendix (J.A.) that are made in parts II and III of this opinion refer to briefs and the Joint Appendix filed in C.A. Nos. 84-1230, et al.; citations in part IV of this opinion to briefs and the Joint Appendix refer to briefs and the Joint Appendix filed in C.A. Nos. 84-1519, et al
 
 
 [2]
 See 17 U.S.C. Sec. 111(d)(5)(A), (C) (1982). Section 111(d)(5)(A) states in pertinent part:
 Notwithstanding any provisions of the antitrust laws, for purposes of this clause any claimants may agree among themselves as to the proportionate division of compulsory licensing fees among them, may lump their claims together and file them jointly or as a single claim, or may designate a common agent to receive payment on their behalf.
 Section 111(d)(5)(C) provides: "During the pendency of any proceeding under this subsection, the Copyright Royalty Tribunal shall withhold from distribution an amount sufficient to satisfy all claims with respect to which a controversy exists, but shall have discretion to proceed to distribute any amounts that are not in controversy."
 
 
 [3]
 This is also the standard of review employed in ratemaking cases coming from the Federal Energy Regulatory Commission ("FERC"), an area in which a highly deferential standard of review has traditionally been applied. See, e.g., Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968); South Dakota Pub. Util. Comm'n v. FERC, 668 F.2d 333, 337 (8th Cir.1982); American Public Gas Ass'n v. FPC, 567 F.2d 1016, 1029 (D.C.Cir.1977)
 
 
 [4]
 The Devotional Claimants are the Christian Broadcasting Network, Inc., the PTL Television Network, and the Old Time Gospel Hour. Each of the Devotional Claimants produces programs which are religious in content, although the Devotionals maintain at some length that their programming is not limited to overtly religious programs. The programs are broadcast on local television stations throughout the country. Although the three claimants are independent of each other, the Tribunal has consistently placed the three together in a separate category, styled "Devotional Claimants," for the purpose of determining awards
 
 
 [5]
 The Tribunal found that sports programs have a special benefit to cable operators that justified a high award to the Joint Sports Claimants. 47 Fed.Reg. 9892-93, J.A. at 33-34. That is, sports programs constitute a particularly significant incentive for prospective cable subscribers to join the evergrowing ranks of cable television subscribers across the country
 
 
 [6]
 The Settling Parties were MPAA (and its associated program producers and syndicators), the Joint Sports Claimants, PBS, the Music Claimants, and National Public Radio. The proposed findings were submitted, pursuant to the Tribunal's established procedures, for the purpose of determining royalty distributions in the 1979 proceeding
 
 
 [7]
 In CBN v. CRT, we also remanded for an explanation of why the Devotionals received treatment different from that accorded Mutual of Omaha's "Wild Kingdom." 720 F.2d at 1310. The Tribunal gave an explanation on remand, 49 Fed.Reg. 20,050, J.A. at 2211, and the Devotional Claimants have not contested that explanation in this appeal
 
 
 [8]
 For example, a CBN executive, Stanley Ditchfield, testified that a cable operator will either broadcast a station carrying CBN programming or CBN's satellite channel, but not both. J.A. at 2243-44. This is scarcely overwhelming evidence which the Tribunal, to engage in reasoned decisionmaking, was obliged to accept. Another example of the Devotionals' evidence is an anecdote about the Charlotte Cable Company's decision not to carry the PTL satellite network because it already imported a Washington, D.C. station that showed the "PTL Club" program. J.A. at 2244-45. This evidence could have been credited, but we cannot fault the Tribunal for determining that evidence of this sort should not alter the outcome
 
 
 [9]
 We cannot fail, however, to fault the Tribunal for its summary rejection of this evidence without setting forth its analysis with some specificity as to why the evidence was deemed lacking. The inadequacy of the Commission's resources and its limited staff have been much observed and decried, see, e.g., CBN v. CRT, supra, 720 F.2d at 1304; National Cable Television Ass'n v. CRT, 689 F.2d 1077, 1087 n. 74 (D.C.Cir.1982), but the bedrock duty remains on the Tribunal to do the job with which it has been tasked. Nonetheless, the manifest weakness of the Devotional Claimants' evidence, especially in view of the daunting burden recognized by our prior decision, leads us, albeit with little enthusiasm, to uphold the Tribunal in this respect
 
 
 [10]
 In the words of Judge Leventhal, in a rather different agency setting,
 [i]f satisfied that the agency has taken a hard look at the issues with the use of reasons and standards, the court will uphold its findings, though of less than ideal clarity, if the agency's path may reasonably be discerned, though of course the court must not be left to guess as to the agency's findings or reasons.
 Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C.Cir.1970). Nonetheless, the Tribunal's silence as to its rationale in this respect is troubling. Considerably more could have been provided by way of explanation, with only a modest effort, and thereby have at least reduced the enormous expenditure of lawyer and judicial effort to divine the thinking of this Tribunal. The pains to which the actors on the judicial-review stage have had to go in this regard lead us emphatically to lay down a clear reminder to the Tribunal that shorthand and toss-away, conclusory sentences are no way to handle a multi-million dollar proceeding.
 
 
 [11]
 The commercial radio broadcasters claim that the explanation the Tribunal now offers for its different treatment of commercial radio and Music Claimants was rejected by this court in CBN v. CRT, supra, as a post hoc argument, and that it was no less post hoc when the Tribunal adopted the argument on remand. But we rejected the compilation argument only because the Tribunal had not given that reason, or indeed any reason, for its differential treatment; thus, the attempt by CRT's counsel in that earlier appeal to give an explanation based on the compilation argument had to be rejected as a post hoc explanation of counsel unsupported by the record. While we expressed doubt as to whether the Tribunal would accept counsel's argument, see 720 F.2d at 1318, we certainly did not hold that the CRT did not or could not accept that argument, since the Tribunal had not spoken to the matter at all. On remand, the Tribunal stated that it had failed in its original decision to indicate precisely what it had been seeking to do with respect to commercial radio and the Music Claimants, and why, 49 Fed.Reg. 20,051, J.A. at 2212; the CRT then gave the explanation we have described in the text. We have no reason to question the Tribunal's clear statement that this was the reasoning it had always had in mind but had failed previously to articulate
 
 
 [12]
 This evidence is summarized in parts II. C. and II. D., infra
 
 
 [13]
 All parties appear to agree that the 1980 award to Multimedia was not based solely on "changed circumstances," see Canadian Claimants Reply Brief at 4-5. To the contrary, the Tribunal discussed in detail new evidence relevant to Multimedia's claim and how that evidence affected Multimedia's award. See 48 Fed.Reg. 9568-69, J.A. at 2206-07
 
 
 [14]
 This evidence is discussed infra pages 934-935 & n. 17
 
 
 [15]
 As suggested by Commissioner Burg's statement, and as more fully described in this court's two previous decisions, the Tribunal divides its Determinations into two phases. In Phase I, the CRT determines the percentage of the Royalty Fund that is to be distributed to each of several general categories. Then, in Phase II, the Tribunal determines the distribution to specific claimants within each category
 
 
 [16]
 For the sake of convenience, the arguments of both NAB and the Canadian Claimants with respect to "changed circumstances" will be attributed solely to NAB
 
 
 [17]
 Indeed, the two cable operators (who were called as witnesses by NAB) are cited by both NAB and MPAA as supporting their respective positions. One of the cable operators testified that cable systems serving small communities tend to bring in stations from major metropolitan areas, not the nearby larger markets. J.A. 2715-16. MPAA blatantly mischaracterizes this evidence by claiming that it shows that people wanted all programming from major areas, not local programming. MPAA Brief at 12. But the major metropolitan stations have local programming, and the cable operator explicitly stated that the superior local programming of these stations is one reason his viewers wanted access to them. J.A. 2715. On the other hand, the testimony that local programming has value does not demonstrate that value to be greater than the 4.5% of the Fund awarded by the Tribunal
 
 
 [18]
 Most claimants settled in the 1981 Distribution. Judiciously, no one elected to appeal the few 1981 claims that the CRT was called upon to resolve
 
 
 [19]
 The PTL Television Network and Old-Time Gospel Hour have asked us to reconsider this holding in the 1979 Determination and again to examine the 1979 evidence to determine whether sufficient evidence of copyright ownership by MPAA was presented. Even were we desirous in this age of congested court dockets to reopen clearly settled issues, the salutary and sensible principles of res judicata happily prevent us from doing so. However, our decision as to the 1979 Determination does not preclude a claimant from presenting new evidence in a later proceeding in an attempt to show that MPAA's claim is no longer supported by substantial evidence. Thus, Multimedia was not precluded from contesting MPAA's claim in the 1982 proceeding
 
 
 [20]
 Atlanta's WTBS is one of several "superstations" that are carried by a great number of cable systems over most of the country, as is Chicago's WGN, referred to infra pages 937-938
 
 
 [21]
 The eight movies, including such memorable blockbusters as "Cast a Dark Shadow," "It's a Wonderful World," and "Sail into Danger," are dutifully set forth for the edification of silver screen aficionados in Multimedia's Brief at page 18
 
 
 [22]
 Multimedia advances several other arguments as to why its award is too low, including a claim that the Tribunal underestimated the amount of programming besides "Donahue" that Multimedia distributed. However, because of the overwhelming importance of "Donahue" to Multimedia's award, none of Multimedia's additional arguments persuade us that its award was outside the zone of reasonableness