**NATIONAL ASSOCIATION OF BROADCASTERS, Petitioner,**

v.

**LIBRARIAN OF CONGRESS and Register of Copyrights, Respondents,**

Canadian Claimants, et al., Intervenors.

**PROGRAM SUPPLIES, Petitioner,**

v.

**LIBRARIAN OF CONGRESS and Register of Copyrights, Respondents,**

National Association of Broadcasters, Intervenor.

**DEVOTIONAL CLAIMANTS, Petitioner,**

v.

**LIBRARIAN OF CONGRESS and Register of Copyrights, Respondents.**

Nos. 96–1449, 96–1450 and 96–1451.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 29, 1998.

Decided June 26, 1998.

279.04. *See* Fed. R.App. P. 10(a); D.C. Cir. R. 30(b). Liddle & Robinson has introduced no contradictory evidence.

Dennis Lane argued the cause for petition-er Program Suppliers.

John I. Stewart, Jr. argued the cause for petitioner National Association of Broadcasters. Jacqueline E. Davis, Jessica R. Herrera and Henry L. Baumann were on brief.

Barry H. Gottfried argued the cause for petitioner Devotional Claimants. Clifford M. Harrington, John H. Midlen, Jr., George R. Grange, II, Richard M. Campanelli and W. Thad Adams, III, were on brief.

Bruce G. Forrest, Attorney, United States Department of Justice, argued the cause for the respondents. Frank W. Hunger, Assistant Attorney General, and William G. Kanter, Attorney, United States Department of Justice, were on the brief.

Timothy C. Hester argued the cause for intervenors Canadian Claimants, et al. Michele J. Woods, L. Kendall Satterfield and Victor J. Cosentino were on brief.

Ronald A. Schechter argued the cause for amicus curiae Joint Sports Claimants. Robert Alan Garrett, Philip R. Hochberg and Judith Jurin Semo were on brief.

Before: GINSBURG, HENDERSON and RANDOLPH, Circuit Judges.

KAREN LECRAFT HENDERSON, Circuit Judge:

A cable television system must pay royalty fees to the Register of Copyrights (Register) in exchange for the privilege of retransmitting to its subscribers certain copyrighted programming. *See* 17 U.S.C. § 111(d). The Librarian of Congress (Librarian) then distributes the collected royalties to the copyright owners. *Id.* § 111(d)(4). In Phase I of the distribution process, royalties are apportioned among eight classes of claimants. *See* Distribution of 1990, 1991 and 1992 Cable Royalties, 61 Fed.Reg. 55,653, 55,655 (1996) (hereinafter Librarian Decision). In Phase II awards are made to individual copyright owners within each of the classes. *Id.* If at either stage a controversy arises regarding the appropriate disposition of all or a portion of the royalties, the Librarian convenes a Copyright Arbitration Royalty Panel to propose a settlement. *See* 17 U.S.C. § 111(d)(4)(B); Majority Report of the Copyright Arbitration Royalty Panel (5/31/96) (hereinafter Panel Report). The panel's proposal is then forwarded to the Librarian, who, on the recommendation of the Register, adopts it or rejects it (in whole or in part) and distributes the disputed royalties accordingly. 17 U.S.C. § 802(f).

Each of the petitioners here is a disappointed class claimant challenging the Librarian's Phase I distribution of royalties collected for the years 1990, 1991 and 1992. Because our review of the Librarian's decision is limited, and because on our limited review none of the petitioners has established a basis to alter or modify its royalty award, we reject their challenges and affirm the Librarian.

## I. BACKGROUND

In 1974 the Supreme Court ruled that a cable television system's retransmission of non-network copyrighted programing to markets distant from those to which it was originally broadcast was not a "performance" under the Copyright Act of 1909, 17 U.S.C. §§ 1 *et seq.*, (hereinafter 1909 Act) and therefore an action for copyright infringement did not lie against the cable system. *See Teleprompter Corp. v. CBS*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); *cf. Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968) (retransmission of non-network copyrighted programming to *local* markets did not give rise to infringement liability under 1909 Act). While it recognized the adverse effect the retransmissions could have on copyright owners, the Supreme Court concluded that "[d]etailed regulation of these relationships [between cable operators and copyright owners], and any ultimate resolution of the many sensitive and important problems in this field, must be left to Congress." *Teleprompter*, 415 U.S. at 414, 94 S.Ct. 1129; *accord Fortnightly*, 392 U.S. at 401, 88 S.Ct. 2084 ("We have been invited ... to render a compromise decision in this case that would, it is said, accommodate the various competing considerations of copyright, communications, and antitrust policy. We decline the invitation. That job is for Congress.").

### A. The Evolving Statutory Framework

In response to the *Fortnightly* and *Teleprompter* decisions, and having struggled with the matter since 1965, the Ninety–Fourth Congress enacted legislation to address the retransmission royalty problem. *See* The Copyright Act of 1976, Pub.L. No. 94–553 (codified as amended at 17 U.S.C. §§ 101 *et seq.*) (hereinafter 1976 Act); *see also* H.R.Rep. No.94–1476, at 89 (1976), U.S. Code Cong. & Admin. News at 5659, 5703–5704 ("The difficult problem of determining the copyright liability of cable television systems has been before the Congress since 1965.") (hereinafter 1976 House Report). The 1976 Act permitted recovery of royalties for non-network programming retransmitted to distant markets but not for other types of retransmitted programming:

> The Committee determined ... that there was no evidence that the retransmission of "local" broadcast signals [to the same markets served by the local broadcasters] threatens the existing market for copyright program owners. Similarly, the retransmission of network programming, including network programming which is broadcast in "distant" markets, does not injure the copyright owner. The copyright owner contracts with the network on the basis of his programming reaching all markets served by the network and is compensated accordingly.
>
> By contrast, their [sic] transmission of distant non-network programming by cable systems causes damage to the copyright owner by distributing the program in an area beyond which it has been licensed. Such retransmission adversely affects the ability of the copyright owner to exploit the work in the distant market. It is also of direct benefit to the cable system by enhancing its ability to attract subscribers and increase revenues. For these reasons, the Committee has concluded that the copyright liability of cable television systems under the compulsory license should be limited to the retransmission of distant non-network programming.

1976 House Report at 90, U.S. Code Cong. & Admin. News at 5704–5705; *accord National Ass'n of Broadcasters v. Copyright Royalty Tribunal,* 675 F.2d 367, 373 (D.C.Cir.1982) ("The Act therefore was not intended to compensate network broadcasts or even local broadcasters whose programs are retransmitted locally by a cable system in the same area.") (hereinafter *NAB I*); *Christian Broadcasting Network, Inc. v. Copyright Royalty Tribunal,* 720 F.2d 1295, 1303 (D.C.Cir.1983) (similar) (hereinafter *CBN*).

Because the Congress believed "that it would be impractical and unduly burdensome to require every cable system to negotiate with every copyright owner whose work was transmitted by a cable system," 1976 House Report at 89, it established a centralized process for the collection and payment of royalties. *See National Broadcasting Co. v. Copyright Royalty Tribunal,* 848 F.2d 1289, 1291 (D.C.Cir.1988) ("The purpose of this regulatory structure is to facilitate the exploitation of copyrighted materials by removing the prohibitive transaction costs that would attend direct negotiations between cable operators and copyright holders, while at the same time assuring copyright holders compensation for the use of their property.") (hereinafter *NBC*). To administer the process, the Congress established the Copyright Royalty Tribunal (Tribunal) and authorized it to periodically adjust royalty rates and distribute collected royalties. *See* 17 U.S.C. §§ 111(d), 801–810 (1976).

Under the 1976 Act, if claimants could not agree on the proper distribution of collected royalties, the Tribunal declared a controversy as to the portion of royalties in dispute and conducted hearings to determine the appropriate apportionment of the funds. *Id.* § 804(d)-(e). The Tribunal had one year to complete its proceedings, *id.* § 804(e), and in its final determination it was to "state in detail the criteria that the Tribunal determined to be applicable to the particular proceeding, the various facts that it found relevant to its determination in that proceeding, and the specific reasons for its determination," *id.* § 803(b).

The Congress did not, however, prescribe the criteria or procedures according to which the Tribunal should assess a claim for royalties:

The Committee recognizes that the bill does not include specific provisions to guide the Copyright Royalty [Tribunal] in determining the appropriate division among competing copyright owners of the royalty fees collected from cable systems under Section 111. The Committee concluded that it would not be appropriate to specify particular, limiting standards for distribution. Rather, the Committee believes that the Copyright Royalty [Tribunal] should consider all pertinent data and considerations presented by the claimants.

1976 House Report at 97, U.S. Code Cong. & Admin. News at 5712. Accordingly, the Tribunal developed three primary criteria—"[1] the harm caused to copyright owners by secondary transmissions of copyrighted works by cable systems, [2] the benefit derived by cable systems from the secondary transmissions of certain copyrighted works, and [3] the marketplace value of the works transmitted," *NAB I*, 675 F.2d at 373—and two secondary criteria—"[4][the] quality of copyrighted program material, and [5] time-related considerations," *id.*—to assess each party's claims.

The 1976 Act also provided for judicial review of the Tribunal's distribution decisions:

Any final decision of the Tribunal in a proceeding under section 801(b) may be appealed to the United States Court of Appeals, within thirty days after its publication in the Federal Register, by an aggrieved party. The judicial review of the decision shall be had, in accordance with chapter 7 of title 5, on the basis of the record before the Tribunal. No court shall have jurisdiction to review a final decision of the Tribunal except as provided in this section.

17 U.S.C. § 810 (1976). Pursuant to this provision, this Court was called on to review the Tribunal's distribution of retransmission royalties for four of the first five years they were collected. *See NAB I*, 675 F.2d at 377–85 (challenges to Tribunal's distribution of 1978 royalties); *CBN*, 720 F.2d at 1305–19 (challenges to Tribunal's distribution of 1979 royalties); *National Ass'n of Broadcasters v. Copyright Royalty Tribunal*, 772 F.2d 922 (D.C.Cir.1985) (challenges to Tribunal's distribution of 1979, 1980 and 1982 royalties) (hereinafter *NAB II*).

As time passed, however, there was insufficient work to justify the existence of a permanent body and therefore, some seventeen years after its creation, the Congress abolished the Tribunal and transferred most of its functions to an ad hoc Copyright Arbitration Royalty Panel. *See* The Copyright Royalty Tribunal Reform Act of 1993, Pub.L. No. 103–198 (codified in relevant part, as amended, at 17 U.S.C. §§ 801–803) (hereinafter 1993 Act). In so doing, the House Committee responsible for the legislation reasoned that

ad hoc arbitration panels are better suited to handle the functions currently handled by the Tribunal. The experience with arbitration under the Section 119 satellite compulsory license was positive, and indicates that this approach can work for the other royalty schemes in title 17. Testimony of witnesses before both Houses on the proposal supports this conclusion.

H.R.Rep. No. 103–286, at 11 (1993), U.S. Code Cong. & Admin. News at 2954, 2958 (hereinafter 1993 House Report).

The 1993 Act also transferred certain of the Tribunal's functions to the Librarian of Congress and the Register of Copyrights:

The Register of Copyrights and the Librarian of Congress will play important roles in convening and reviewing the decisions of the arbitration panels. The Copyright Office is currently the "front end" of the compulsory license system. Statements of Account [of royalties owed] for the section 111, 119, and 1005 licenses are filed with the Office. The royalties paid in under these licenses are then deposited by the Copyright Office into the United States Treasury. ... The Copyright Office also has authority to promulgate regulations for the administration of these functions. Section 806 of the Copyright Act requires the Library of Congress to provide the Copyright Royalty Tribunal with necessary administrative services, including those related to budgeting, accounting, financial reporting, travel, personnel, and procurement.

In short, the Copyright Office and the Library of Congress already have considerable involvement in the administration of compulsory licenses and in the work of the Tribunal. When combined with the Copyright Office's almost 100 year experience in copyright issues, assigning some of the duties formally carried out by the Tribunal to the Office and the Library makes good sense.

*Id.* (footnote omitted).

Accordingly, under the new distribution scheme established by the 1993 Act, an arbitration panel is now entrusted with initial responsibility for formulating a proposed distribution of disputed royalties. *See* 17 U.S.C. §§ 801–802. The arbitration panel has 180 days to hear evidence and develop the proposed settlement of outstanding claims. *Id.* § 802(e). It must "act on the basis of a fully documented written record, prior decisions of the Copyright Royalty Tribunal, prior copyright arbitration panel determinations, and rulings by the Librarian of Congress under section 801(c)." *Id.* § 802(c). Within the same 180–day period the panel must include its proposed settlement in a report, setting "forth the facts that the arbitration panel found relevant to its determination," and it must forward the report and accompanying written record to the Librarian:

Within 60 days after receiving the report of a copyright arbitration royalty panel under subsection (e), the Librarian of Congress, upon the recommendation of the Register of Copyrights, shall adopt or reject the determination of the arbitration panel. The Librarian shall adopt the determination of the arbitration panel unless the Librarian finds that the determination is arbitrary or contrary to the applicable provisions of this title. If the Librarian rejects the determination of the arbitration panel, the Librarian shall, before the end of that 60–day period, and after full examination of the record created in the arbitration proceeding, issue an order setting the royalty fee or distribution of fees, as the case may be. The Librarian shall cause to be published in the Federal Register the determination of the arbitration panel and the decision of the Librarian (including an order issued under the preceding sentence). The Librarian shall also publicize such determination and decision in such other manner as the Librarian considers appropriate. The Librarian shall also make the report of the arbitration panel and the accompanying record available for public inspection and copying.

*Id.* § 802(f).

The Librarian's decision can then be reviewed by this Court:

Any decision of the Librarian of Congress under subsection (f) with respect to a determination of an arbitration panel may be appealed, by any aggrieved party who would be bound by the determination, to the United States Court of Appeals for the District of Columbia Circuit, within 30 days after the publication of the decision in the Federal Register. If no appeal is brought within such 30–day period, the decision of the Librarian is final, and the royalty fee or determination with respect to the distribution of fees, as the case may be, shall take effect as set forth in the decision. ... The court shall have jurisdiction to modify or vacate a decision of the Librarian only if it finds, on the basis of the record before the Librarian, that the Librarian acted in an arbitrary manner. If the court modifies the decision of the Librarian, the court shall have jurisdiction to enter its own determination with respect to the amount or distribution of royalty fees and costs, to order the repayment of any excess fees, and to order the payment of any underpaid fees, and the interest pertaining respectively thereto, in accordance with its final judgment. The court may further vacate the decision of the arbitration panel and remand the case to the Librarian for arbitration proceedings in accordance with subsection (c).

*Id.* § 802(g).

## B. The Petitioners' Challenges

The petitioners are the first to challenge a decision of the Librarian under the new royalty distribution process established by the 1993 Act. Each represents a distinct class of claimants: Program Suppliers (Programmer) represents the copyright owners of syndicat-

ed television series, movies and television specials;[1] National Association of Broadcasters (NAB) represents the copyright owners of programs, like news and local interest material, that are produced and broadcast by only a single television station;[2] and Devotional Claimants (Devotional) represents the copyright owners of "[s]yndicated programs of a primarily religious theme, not limited to those produced by or for religious institutions," Panel Report at 13, that do not fall within another category of programming.[3]

At issue is more than $500 million in royalties—the total amount collected for non-network programming retransmitted to distant markets in calendar years 1990, 1991 and 1992.[4] The disputed royalties consist of "Basic Funds," "3.75% Funds" and "Syndex Funds," which in turn are subdivided into 1990 collections and 1991–1992 collections. The Basic Funds include all of the royalties collected from small- and medium-sized cable systems as well as the royalties collected from large cable systems for retransmissions that were permitted under the now defunct, distant signal carriage rules of the Federal Communication Commission (FCC). *See* Li-

brarian Decision, 61 Fed.Reg. at 55,654. The 3.75% Funds and Syndex Funds consist of royalties collected exclusively from large cable systems for retransmissions that are now permitted as a result of the FCC's repeal of its distant signal carriage and syndication exclusivity rules, respectively.[5] *Id.*

The Librarian declared a Phase I distribution controversy and convened a copyright arbitration royalty panel (Panel) on December 4, 1995. *Id.* at 55,655. The Panel conducted approximately 50 days of evidentiary hearings during which it heard the testimony of more than 50 witnesses and it reviewed over 200 exhibits and hundreds of pages of written testimony submitted by the class claimants. *See* Panel Report at 25. The record was closed on March 29, 1996, after which the claimants submitted over one thousand pages of post-hearing briefs. *Id.* at 17. The three-member Panel, with one dissent, reported its proposed distribution to the Librarian on May 31, 1996. *See* Letter from Panel Chair to Librarian of 5/31/96. In its report, the Panel proposed the following Phase I apportionment for the non-settling class claimants:

1. Syndicated series and specials consist of the following:

 . (1) programs licensed to and broadcast by at least one U.S. commercial television station during the calendar year in question; (2) programs produced by or for broadcast by two or more U.S. television stations during the calendar year in question; and (3) programs produced by or for a U.S. commercial television station that are comprised predominantly of syndicated elements, such as music video shows, cartoon shows, "PM Magazine," and locally hosted movie shows. Syndication refers to selling programming on a market-by-market basis to broadcast television stations in the United States. "Off-network" syndication refers to programming syndicated after having first appeared on a network. "Cheers" and "Roseanne" are examples. "First run" syndication refers to programs first appearing in syndication, such as talk and game shows. Panel Report at 11–12.

2. The Panel Report describes NAB's programming as follows: "[p]rograms produced by or for a U.S. commercial television station and broadcast only by that one station during the calendar year in question and not coming within the exception described in subpart (3) of the 'Program Suppliers' definition." Panel Report at 12–13 (referring to subpart (3) quoted *supra* at note 1).

3. The Librarian also awarded a share of the royalties to five other classes of copyright owners—i.e., Joint Sports Claimants (JSC), Music Claimants (MC), National Public Radio (NPR), Public Broadcasters (PBS) and Canadian Claimants (CC). PBS and CC have intervened in this litigation, filing a joint brief in support of the Librarian's distribution decision. Each of the petitioners has also joined in the portions of the intervenors' brief that are not adverse to its claims. JSC has filed an *amicus curiae* brief, supporting the Librarian's decision and opposing certain of the arguments advanced by the petitioners.

4. The Tribunal, it appears, was in the midst of a distribution proceeding to determine the proper Phase I apportionment of 1990 royalties just before the Congress enacted the 1993 Act. *See* Librarian Decision at 55,655. When it became clear that the Tribunal would be abolished by the 1993 Act, the 1990 proceedings were suspended and, at the urging of the parties, the Librarian convened a panel to develop a proposed settlement for not only the 1990 royalties but also the 1991 and 1992 funds. *Id.*

5. The 3.75% Fund is named for the formula by which the royalties are calculated—i.e., 3.75% of gross receipts. *See* Librarian Decision, 61 Fed. Reg. at 55,654.

**Table 1: Panel's Proposed Phase I Apportionment of Royalties**

| Claimants | Basic Fund (1990) | Basic Fund (1991-1992) | 3.75 Fund (1990-1992) | Syndex Fund (1990-1992) |
|---|---|---|---|---|
| Programmer | 55.55% | 55.00% | 58.60% | 100.00% |
| NAB | 7.58% | 7.50% | 7.50% | None |
| Devotional | 1.26% | 1.25% | 0.95% | None |
| PBS | 5.81% | 5.75% | None | None |
| JSC | 29.80% | 29.50% | 32.60% | None |
| CC | None | 1.00% | 0.35% | None |

*Source*: Panel Report at 143.

The proposed awards differed significantly from those the Tribunal had last approved before its abolition:

**Table 2: Tribunal's Phase I Apportionment of 1989 Royalty Funds**

| Claimants | Basic Fund (1989) | 3.75 Fund (1989) | Syndex Fund (1989) |
|---|---|---|---|
| Programmer | 60.00% | 62.60% | 95.50% |
| NAB | 5.70% | 5.70% | None |
| Devotional | 1.25% | 0.95% | None |
| PBS | 4.00% | None | None |
| MC | 4.50% | 4.50% | 4.50% |
| JSC | 23.80% | 26.00% | None |
| CC | 0.75% | 0.25% | None |

*Source:* Certified Questions from the Register of Copyrights to the Copyright Arbitration Royalty Panel of 7/16/96, at 2 (hereinafter Certified Questions to Panel).

---

After reviewing the Panel's findings, the Register notified the class representatives of a meeting to discuss certain perceived shortcomings in the Panel's report:

We have reviewed the Panel's report, the petitions to modify and the replies filed by the parties to this proceeding. It is evident that the report cannot be adopted by the Librarian in its present form, and would not be sustainable on appeal. Despite the report's length, there is a significant absence of findings of fact and conclusions of law supporting the Panel's specific determinations. The report consequently lacks adequate explanation justifying the Panel's awards. Without such explanation, the Librarian cannot evaluate the Panel's reasoning to determine if it acted in an arbitrary manner.

We have also examined the record in this proceeding and have determined that the Librarian cannot engage in a *de novo* review of the merits of this case. First, as the Canadian Claimants aptly point out in their reply, *de novo* review cannot be completed in the 60–day time period. Second, and more importantly, the record is not

complete with respect to some issues. Without further development, there is no evidence upon which the Librarian can reach a conclusion, preventing him from making his own determination as to the royalty distribution.

The Copyright Act is silent as to the Librarian's authority to remand the [Panel] report for further development and explanation. We have determined, however, that a remand is the appropriate solution in this proceeding and will most likely produce an ultimate determination that will withstand judicial review.

Letter from Register of Copyrights to Phase I Cable Parties of 7/3/96.

At the meeting, the claimants generally expressed their reservations about the legality and wisdom of a remand to the Panel. *See* Meeting of 7/11/96 Tr. 6–58. The Register nonetheless determined that the best way to proceed was to submit a series of "certified questions" to the Panel so that it could elaborate on its reasons for specific percentage awards. *See* Certified Questions to Panel at 1 ("The questions are intended to probe the original intent of the Panel only. They are not intended to reopen any issues or invite any reconsideration."). The Panel responded to the questions on August 29, 1996, emphasizing that royalty shares could not be determined with mathematical precision and were inescapably dependent on the Panel's exercise of its informed judgment as to the relative merits of each class's claims:

> The point is, after reviewing and weighing the surveys and all other relevant information, it is the Panel's function to make a final judgment as to the award of each party. There was a considerable difference of opinion in weighing all the evidence as is partly evident by the fact that the Panel was not unanimous in its judgment. To reach the judgment as it exists there had to be, and there was, a significant compromise. The above comments emanate from discussions with the Copyright Office and the tenor of certain questions which suggests that there is a precision [sic] or mathematical way to calculate these awards by placing weights on all the categories. The Panel can somewhat con-

fine the awards by making observations on the surveys and observations on the other evidence presented. However, in its final aspect the Panel has to use its judgment.

> ... A great deal of pressure was placed on the Panel members, not only to analyze and consider [the evidence], but also to debate and agree on a judgment—one that by its very nature required a relatively precise quantification of the final results. Clearly, the most important element of the decision was the "judgment" of the Panel. The Panel assimilated this information and feels comfortable that it understood the evidence and arguments as presented. In writing the report itself, the Panel simply ran out of time. In the experience of at least one member of the Panel, the report, when issued, was about midway from where it would be if it were an opinion published in an appellate report. It needed considerable editing and tightening. The Panel wishes to emphasize, however, that it abides by its essential judgments in this proceeding.

Copyright Arbitration Royalty Panel Responses of 8/29/96 to Certified Questions from the Register of Copyrights, at 2–3 (hereinafter Panel Responses to Certified Questions).

After reviewing the Panel's substantive responses to each of the certified questions, the Register recommended adoption of the Panel's findings with adjustments to account for (1) the Music Claimants' and National Public Radio's settlement of their claims to the Basic and Syndex Funds and (2) the Panel's other errors, admitted and otherwise, in apportioning the 3.75 Funds. *See* Librarian Decision, 61 Fed.Reg. at 55,660–64. The Librarian adopted the Register's recommendation without modification: "Having duly considered the recommendation of the Register of Copyrights regarding the report of the Copyright Arbitration Royalty Panel in the distribution of the 1990–1992 cable funds, the Librarian of Congress fully endorses and adopts her recommendation to accept the Panel's decision in part and reject it in part." *Id.* at 55,669. Accordingly, a summary of the final apportionment of royalties approved by the Librarian is as follows:

**Table 3: Librarian's Phase I Apportionment of Royalties**

| Class Claimants & Collection Years | Basic Funds | 3.75 Funds | Syndex Funds |
| --- | --- | --- | --- |
| Programmer | | | |
| -1990 | 52.6336250% | 56.0125439% | 95.5000000% |
| -1991-1992 | 52.5250000% | 56.0131375% | 95.5000000% |
| JSC | | | |
| -1990 | 28.2355000% | 31.1605620% | None |
| -1991-1992 | 28.1725000% | 31.2299325% | None |
| NAB | | | |
| -1990 | 7.1820500% | 7.1688409% | None |
| -1991-1992 | 7.1625000% | 7.1625000% | None |
| MC | | | |
| -1990 | 4.5000000% | 4.5000000% | 4.5000000% |
| -1991-1992 | 4.5000000% | 4.5000000% | 4.5000000% |
| PBS | | | |
| -1990 | 5.5049750% | None | None |
| -1991-1992 | 5.4912500% | None | None |
| Devotional | | | |
| -1990 | 1.1938500% | 0.9080532% | None |
| -1991-1992 | 1.1937500% | 0.9072500% | None |
| CC | | | |
| -1990 | 0.7500000% | 0.2500000% | None |
| -1991-1992 | 0.9550000% | 0.1871800% | None |

*Source:* Librarian Decision, 61 Fed.Reg. at 55,669.

The petitioners timely appealed the Librarian's decision. NAB contends that it should have been awarded an 8.897025% share of the 1990 Basic and 3.75 Funds and an 8.815% share of the 1991–1992 Basic and 3.75 Funds, both of which increases should be effected by corresponding reductions in Programmer's award. Devotional claims that it should have been awarded a three per cent share of the Basic and 3.75 Funds, or at the very least, its awards should have been no lower than those proposed by the Panel; it does not indicate, however, from whose award or awards such increases should come. Finally, Programmer argues that it deserves a larger award, the amount and source of which can be determined only on remand to the Librarian.

## II. STANDARD OF REVIEW

As provided by subsection 802(g) of the 1993 Act, we may "modify or vacate a decision of the Librarian only if [we] find[ ], on the basis of the record before the Librarian, that the Librarian acted in an arbitrary manner." *See* 17 U.S.C. § 802(g). The corresponding provision of the 1976 Act, section 810, permitted review of a Tribunal decision "in accordance with chapter 7 of title 5, on the basis of the record before the Tribunal." 17 U.S.C. § 810 (1976). Notwithstanding the difference in language between the 1993 Act and the 1976 Act, Devotional contends that our review of the Librarian's decision should be no different from our review of a Tribunal decision; in both instances, the Administrative Procedure Act (APA)—i.e., 5 U.S.C. § 706(2)—supplies the appropriate standard of review. Similarly, Programmer argues that the APA's arbitrary and capricious test, 5 U.S.C. § 706(2)(A), as interpreted in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), should control. Finally, NAB also claims that we should continue to review the Librarian's royalty distribution decision

under a variant of the APA's arbitrary and capricious test, *see Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856 ("In reviewing [an agency's] explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment") (quotations omitted), although it concedes that APA review may now be more limited than in the past and that the "substantial evidence" test, 5 U.S.C. § 706(2)(E), no longer applies.

Conversely, the intervenors argue that the APA's arbitrary and capricious standard no longer applies: pursuant to subsection 802(f), the Librarian is obliged to adopt the Panel's proposed settlement unless he finds it "arbitrary or contrary to the applicable provisions of" Title 17; in turn, under subsection 802(g), we may modify or remand the Librarian's decision only if we conclude that he "acted in an arbitrary manner" in applying the section 802(f) standard; this "double arbitrary" standard is therefore narrower than APA review.[6] The Librarian goes even further, arguing that our "judicial review role in this case is at the outer edge of cases barely reviewable under a criterion of substantive correctness."[7] Librarian Br. 14.

We conclude that our review of the Librarian's distribution decision under subsection 802(g) is significantly more circumscribed than the review we made of Tribunal decisions under section 810. As a result, in applying the "arbitrary manner" standard set forth in subsection 802(g), we will set aside a royalty award only if we determine

that the evidence before the Librarian compels a substantially different award. We will uphold a royalty award if the Librarian has offered a facially plausible explanation for it in terms of the record evidence. While the standard is an exceptionally deferential one, we think it is most consistent with the intent of the Congress as reflected in the language, structure and history of the 1993 Act.[8]

### A. The Congress's Intent

Under the APA standards incorporated by section 810, judicial review of the Tribunal's royalty distribution decisions was already quite deferential. *See NAB II*, 772 F.2d at 926 n. 3 (noting that standard of review applied to Tribunal royalty apportionments is same standard "employed in ratemaking cases coming from the Federal Energy Regulatory Commission[ ], an area in which a highly deferential standard of review has traditionally been applied"). As we observed,

> the judicial task is not to weigh the evidence and fix what in our view would constitute appropriate percentages, for that would be to intrude into the function entrusted to the Tribunal. Our job, rather, is to determine whether the royalty awards are within a "zone of reasonableness"—not unreasonably high or unreasonably low—and that the CRT's decision is neither arbitrary nor capricious, and is supported by substantial evidence.

*NAB II*, 772 F.2d at 926; *accord CBN*, 720 F.2d at 1304 ("In acknowledging the need for substantial evidence, however, we emphasize

---

**6.** Any difference between a "double-arbitrary" standard and a "single-arbitrary" standard may well be illusory for if the Panel's proposed award is patently arbitrary or plainly contravenes another provision of Title 17, the Librarian's decision to approve the award without modification would constitute "act[ing] in an arbitrary manner" as well.

**7.** The Register's recommendation to the Librarian (which was apparently adopted by the Librarian without alteration) suggests that the Librarian's review of the Panel's proposed settlement is indistinguishable from this Court's review of Tribunal royalty distribution decisions. *See* Librarian Decision, 61 Fed.Reg. at 55,656 ("Neither the [1993] Act nor its legislative history indicates what is meant specifically by 'arbitrary,' but there is no reason to conclude that the use of the

term is any different than the 'arbitrary' standard described in the [APA]."). Contrary to Programmer's contention, however, the Register did not assert that our review of the Librarian's decision had not changed. *See id.* at 55,656–57.

**8.** Even had the standard of review remained the same, we are doubtful that any of the petitioners' arguments would lead us to disturb the Librarian's Phase I apportionment. Nonetheless, given our past experience with the "highly litigious copyright-owner subculture," *NAB II*, 772 F.2d at 940, we think it useful to decide the standard of review question now. *But cf. Natural Resources Defense Council, Inc. v. EPA*, 725 F.2d 761, 767–68 (D.C.Cir.1984) (declining to select standard of review because regardless of standard applied result would be same).

that the Tribunal's choice of a particular percentage allocation is not reviewable for exact precision, but simply for rationality; we are without power to set aside a particular percentage allocation provided that it is within a 'zone of reasonableness.' "); *NAB I*, 675 F.2d at 374 ("Claims of this sort are generally well beyond the expertise or authority of courts, however, and Congress made clear its awareness of our limitations by making the Tribunal the primary arbiter of these claims."); *cf. Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951) ("Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the Commission.").

While the section 810 standard was "highly deferential," in enacting the 1993 Act the Congress apparently concluded that the standard was not deferential enough, as evidenced by the repeal of section 810 and the enactment of subsection 802(g)—a provision that contains no reference to the APA. We therefore reject Devotional's assertion that the Congress did not intend to change the standard of review applicable to royalty distribution decisions as to so hold would ignore plain evidence of the Congress's intent to the contrary, a disfavored construction. *See Brewster v. Gage*, 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457 (1930) ("The deliberate selection of language so differing from that used in earlier Acts indicates that a change of law was intended."); *In re Request for Assistance*, 848 F.2d 1151, 1154 (11th Cir. 1988) ("When the legislature deletes certain language as it amends a statute, it generally indicates an intent to change the meaning of the statute."), *cert. denied*, 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989). In light of the Congress's decision to remove from the judicial review provision of the 1993 Act any reference to the APA, we also conclude that Programmer and NAB err in suggesting that the arbitrary and capricious standard continues to control our subsection 802(g) review.[9]

Moreover, subsection 802(g) plainly does not evince a congressional intent to subject the Librarian's decision to more searching review than we have in the past applied to a Tribunal decision. Further, we cannot ignore the simplification of review language the 1993 Act achieved: we now ask simply whether "on the basis of the record before

---

9. The 1993 Act also repealed subsection 803(a) of the 1976 Act, which provided that, "[e]xcept as otherwise provided in this chapter, the Tribunal shall be subject to the provisions of the Administrative Procedure Act [] ( . . . title 5, United States Code, chapter 5, subchapter II and chapter 7)." 17 U.S.C. § 803(a) (1976). The 1993 Act's sole reference to the APA is found in subsection 802(c), which requires the *Panel* to conduct its proceedings "subject to subchapter II of chapter 5 of title 5"—the notice and comment provisions of the APA. *See* 17 U.S.C. § 802(c).

We find these changes, together with the significant structural changes effected by the 1993 Act, to be compelling evidence of the Congress's intent to limit the applicability of the APA. Thus, to the extent the petitioners argue that the strong presumption in favor of applying the APA requires us to adhere to the review standards set forth in 5 U.S.C. § 706(2), we think this is one of those unusual circumstances in which the Congress's intent is sufficiently clear to overcome the presumption. Indeed, the Supreme Court reached a similar conclusion in somewhat analogous circumstances:

Exemptions from the terms of the Administrative Procedure Act are not lightly to be presumed in view of the statement in § 12 of the Act that modifications must be express. . . . But we cannot ignore the background of the 1952 immigration legislation, its laborious adaptation of the Administrative Procedure Act to the deportation process, the specific points at which deviations from the Administrative Procedure Act were made, the recognition in the legislative history of this adaptive technique and of the particular deviations, and the direction in the statute that the methods therein prescribed shall be the sole and exclusive procedure for deportation proceedings. Unless we are to require the Congress to employ magical passwords in order to effectuate an exemption from the Administrative Procedure Act, we must hold that the present statute expressly supersedes the hearing provisions of that Act.

*Marcello v. Bonds*, 349 U.S. 302, 310, 75 S.Ct. 757, 99 L.Ed. 1107 (1955); *accord Asiana Airlines v. FAA*, 134 F.3d 393, 396–99 (D.C.Cir. 1998) (finding APA notice and comment requirements inapplicable because their application would render superfluous statutory language specifying rulemaking procedures agency was to follow).

the Librarian, ... the Librarian acted in an arbitrary manner," 17 U.S.C. § 802(g), whereas formerly we asked whether the Tribunal's decision was

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of · [Title 5] or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2). Thus, for us to conclude that acting in an "arbitrary manner" is synonymous with the list of administrative transgressions set forth in the APA would be absurd. *Cf. Steadman v. SEC*, 450 U.S. 91, 98–99, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981) (finding significant difference between APA's "substantial evidence" test and statutory language requiring that agency's order be "supported by and in accordance with ... substantial evidence").

The 1993 Act also establishes a royalty distribution structure that differs from its predecessor in important respects. First, the 1993 Act inserts an additional layer of administrative review by the Register and the Librarian between the factfinder's conclusions and our review. *See* 17 U.S.C. § 802(e)-(f). The Tribunal, however, had both the first and last administrative word under the procedure established by the 1976 Act. *See* 17 U.S.C. §§ 801–810 (1976). Second, the two-stage decisionmaking process

established by the 1993 Act must now be completed in 240 days whereas the Tribunal had 365 days to conclude its single-stage process under the 1976 Act. *Compare* 17 U.S.C. § 802(e)-(f), *with* 17 U.S.C. § 804(e) (1976). Third, the Panel's report must be accompanied by the written record and need set forth only "the facts that the arbitration panel found relevant to its determination," *id.* § 802(e), whereas the Tribunal was obliged to "state in detail the criteria that [it] determined to be applicable to the particular proceeding, the various facts that it found relevant to its determination in that proceeding, and the specific reasons for its decisions," 17 U.S.C. § 803(b) (1976).[10] Fourth, and perhaps most significantly, the 1993 Act changes the paradigm for administrative decisionmaking: it replaces the Tribunal's quasi-adjudication with an arbitration undertaken by an ad hoc panel whose proposed settlement is then reviewed by final decisonmakers, the Register and the Librarian. *See* 1993 House Report at 11 ("The experience with arbitration under the Section 119 [of Title 17] satellite compulsory license was positive, and indicates that this approach can work for the other royalty schemes in title 17").

The foregoing structural changes are also perfectly consistent with the Congress's evident intent to facilitate expeditious and informal settlement of claims at the administrative level and to discourage resort to formal, protracted and costly judicial processes of resolving disputes.[11] *See id.* at 13 ("[T]he panels, with the assistance of the Copyright Office, must promulgate and be governed by clear procedural and evidentiary guidelines designed to ensure fundamental fairness. Rules of discovery that can expedite the parties' presentation of their cases are particularly important in this respect, since early discovery and clear evidentiary rulings can go far in facilitating settlements and a more streamlined arbitration process."); *cf. Devine*

---

10. While the legislative history of the 1993 Act states that "[a] clear report setting forth the panel's reasoning and findings will greatly assist the Librarian of Congress" in conducting his review of the report, a "clear report" is not required under subsection 802(e). 1993 House Report at 13.

11. Indeed, almost two years will have elapsed from the date of the Librarian's final decision to judicial resolution of the parties' claims for royalties that were collected, in some instances, more than eight years ago.

*v. White*, 697 F.2d 421, 436 (D.C.Cir.1983) ("Such a shift from the arbitral model, in which decision makers are free to focus solely on the case before them rather than on the case as it might appear to an appellate court, to the administrative model, in which decision makers are often concerned primarily with building a record for review, would substantially undercut the ability of arbitrators successfully to resolve disputes. . . ."); *Office & Professional Employees Union, Local 2 v. Washington Metro. Area Transp. Auth.*, 724 F.2d 133, 137 (D.C.Cir.1983) ("If parties to arbitration could freely relitigate their complaints in the courts, arbitration would cease to be a method to achieve prompt resolution of conflict, but would instead become a new layer of review, and a new cause for delay.").

We find additional evidence of a legislative intent to narrow the scope of judicial review in the history of the 1993 and the 1976 Acts. The Senate bill that originally gave rise to the 1976 Act would have limited judicial review of a Tribunal decision to three circumstances: "(1) The determination was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in any of the members of the Tribunal, or (3) any member of the Tribunal was guilty of any misconduct by which the rights of any party were prejudiced." 1976 House Report at 179. This standard is materially indistinguishable from the one set forth in the Arbitration Act. *See infra* note 12. The House, however, concluded that the Senate's judicial review provision was "far too restrictive," 1976 House Report at 179, and thus it reported an amendment to the bill, providing "for the full scope of review provided by Chapter 7 of the Administrative Procedure Act," *id.* The House prevailed and section 810, providing for full APA review, became law. *See* H.R. Conf. Rep. No. 94–1733, at 81–82 (1976).

In enacting the 1993 Act, however, the House appears to have come around to something closer to the Senate's original proposal to limit judicial review of royalty distribution decisions to claims cognizable under the Arbitration Act. *Compare infra* note 12 (setting forth Arbitration Act review provision that authorizes court to set aside award where there is "evident partiality or corruption" by arbitrator), *with* 1993 House Report at 12–13 (1993), U.S. Code Cong. & Admin. News at 2959–2960 ("Given that many arbitrations will involve multiple parties, the Librarian of Congress and the Register of Copyrights must be scrupulous to avoid even the appearance of selecting arbitrators that may be believed, incorrectly or not, to favor one party.").

We agree nonetheless with the Librarian that there is insufficient evidence to conclude that the Congress, in enacting subsection 802(g), intended to adopt the extremely circumscribed review standard set forth in the Arbitration Act, 9 U.S.C. § 10.[12] The 1993 Act does not expressly refer to the Arbitration Act and the "arbitrary manner" language of subsection 802(g) is far from synonymous with the limited procedural and ethical infirmities supporting vacatur of an arbitration award pursuant to the Arbitration Act. *Cf. Office & Professional Employees*, 724 F.2d at 139 ("Because the statutory framework of the [Railway Labor Act (RLA)] and of the Compact [interstate agreement authorized by the Congress] are substantially dissimilar, we cannot assume, without any supporting evidence of legislative intent, that the mere presence in both statutes of the words 'final and binding' permits a court to superimpose the RLA's congressionally-enacted standard of review [for arbitration awards] onto the Compact."). Further, the structure of the royalty distribution system, interposing a layer of admin-

**12.** Under the Arbitration Act, a district court is authorized to set aside an arbitrator's award only in the following circumstances:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

istrative review between the "arbitrators'" decision and our review of that decision, further distinguishes the system established by the 1993 Act from arbitrations covered by the Arbitration Act. *See* Librarian Decision, 61 Fed.Reg. at 55,656 ("Typically, an arbitrator's decision is not reviewable, but the [1993] act created two layers of review: the Librarian and the Court of Appeals for the District of Columbia."). Finally, review of the merits of an arbitrator's decision is generally proscribed by the Arbitration Act, *cf. Timken Co. v. Local Union No. 1123, United Steelworkers of Am., AFL–CIO,* 482 F.2d 1012, 1014 (6th Cir.1973) ("[W]hile a court is empowered to determine whether an arbitrator's award exceeded the limits of his contractual authority … it may not review the merits of an arbitration award."), whereas subsection 802(g) appears to permit some (albeit quite limited) review of the merits of the Librarian's assessment of the settlement.

### B. Applicable Standard of Review

■ Having sketched the general limits of our review, we must now give content to the "arbitrary manner" standard of subsection 802(g) and in so doing define more clearly the path we follow in reviewing decisions of the Librarian. *Cf. Steadman v. SEC,* 450 U.S. 91, 95, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981) ("Where Congress has not prescribed the degree of proof which must be adduced by the proponent of a rule or order to carry its burden of persuasion in an administrative proceeding, this Court has felt at liberty to prescribe the standard, for it is the kind of question which has traditionally been left to the judiciary to resolve.") (internal quotations, brackets and citations omitted). As we have repeatedly emphasized in earlier royalty distribution decisions, any standard of review must be adapted to fit the administrative decisionmaking process to which it is to be applied. *See NAB I,* 675 F.2d at 375 ("Our assessment of the Tribunal's procedures must consider the difficulties facing the agency and the mandate given it by Congress."); *Recording Indus. Ass'n v. Copyright Royalty Tribunal,* 662 F.2d 1, 8 (D.C.Cir.1981) ("[W]e must bear in mind that the thoroughness of the factual support an agency can supply for its decision will vary

with the nature of the decision being made.") (hereinafter *RIA*); *National Cable Television v. Copyright Royalty Tribunal,* 724 F.2d 176, 181 (D.C.Cir.1983) ("The tautness of court surveillance of the rationality of agency decisionmaking, however, depends on the nature of the task assigned to the agency. … [I]f Congress entrusts a novel mission to an agency and specifies only grandly general guides for the agency's implementation of legislative policy, judicial review must be correspondingly relaxed.") (hereinafter *NCT*). Further, the standard to which we hold an administrative decisionmaker may become more rigorous over time as the decisionmaker acquires greater experience with a particular administrative scheme. *See CBN,* 720 F.2d at 1319 ("As the Tribunal continues to accumulate experience with royalty fee distributions, we continue to hope that the clarity of its decisionmaking will improve."); *cf. Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) ("We are, in addition, obliged at this juncture to give weight to the unusual difficulties of the first area proceeding; we must, however, emphasize that this weight must significantly lessen as the Commission's experience with area regulation lengthens.").

More fundamentally, in framing the standard of review, we must respect the Congress's delegation of exceedingly broad authority to the Librarian, as advised by the Register and the Panel, to apportion royalties appropriately among the claimants, just as we earlier honored the expansive authority entrusted to the Tribunal to do the same:

> We emerge from our analysis of these inherently subjective judgment calls and rough balancing of hotly competing claims with one overriding conclusion: it is the Tribunal [now Librarian] which Congress, for better or worse, has entrusted with an unenviable mission of dividing up the booty among copyright holders. … [T]he broad discretion necessarily conferred on the Copyright Royalty Tribunal [now Librarian] in making its distributions is emphatically clear.

*NAB II,* 772 F.2d at 940; *accord NCT,* 724 F.2d at 182 ("In sum, Congress vested in the Tribunal legislative discretion greater than

that committed to regulatory agencies engaged in cost of service rate making. ... We must recognize the judgmental expertise of the Tribunal's members regarding copyright policy, ... and demand only an accounting adequate to assure us that the rates we review are not lacking in rationality.").[13]

 With respect to the particular administrative scheme established by the 1993 Act, we note that although the word "arbitrary" appears in both subsections 802(g) and 802(f), our "arbitrary manner" review of the Librarian's decision is not coextensive with the Librarian's "arbitrary and legal" review of the Panel's proposed settlement. *Compare* 17 U.S.C. § 802(g) (authorizing court to vacate or modify decision if "the Librarian acted in an *arbitrary manner*") (emphasis added), *with id.* § 802(f) (requiring Librarian to adopt Panel's proposed settlement unless it "is *arbitrary* or contrary to the applicable provisions of this title") (emphasis added). This is not a surprising administrative arrangement given the bifurcated review of royalty awards (first by the Librarian and then by this Court) and the deference to be accorded the Register's and the Librarian's expertise in royalty distribution. *Cf. Concrete Pipe & Prods. of California, Inc. v. Construction Laborers Pension Trust for S. California,* 508 U.S. 602, 623, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("[A] reviewing body characteristically examines prior findings in such a way as to give the original factfinder's conclusions of fact some degree of deference.

This makes sense because in many circumstances the costs of providing for duplicative proceedings are thought to outweigh the benefits (the second would render the first ultimately useless), and because, in the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence."); *United States v. Morgan,* 313 U.S. 409, 416–17, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) ("Another attack upon the Secretary's order is the conventional objection that the findings were not rooted in proof. To reexamine here with particularity the extensive findings made by the Secretary and to test them by a record of 1340 printed pages and thousands of pages of additional exhibits would itself go a long way to convert a contest before the Secretary into one before the courts.").

 Moreover, subsection 802(g) plainly limits our review to the *Librarian's* decision. That the *Panel* may have acted arbitrarily affords no basis for this Court to set aside a royalty award unless the Librarian "acted in an arbitrary manner" in ratifying the Panel's action. For example, we think the Librarian would plainly act in an arbitrary manner if, without explanation or adjustment, he adopted an award proposed by the Panel that was not supported by any evidence or that was based on evidence which could not reasonably be interpreted to support the award.

**13.** To the extent the petitioners claim that the Librarian's decision is not entitled to deference because ad hoc arbitration members do not possess expertise in the area of cable royalties, we think their claim misapprehends the source of our solicitude towards the administrative decisionmaker's expertise. The Panel, as the initial factfinder, is in the best position to weigh evidence and gauge credibility. *See Concrete Pipe, infra; cf. Asociacion de Compositores Y Editores de Musica Latinoamericana v. Copyright Royalty Tribunal,* 854 F.2d 10, 13 (2d Cir.1988) ("[W]e must review a challenge to the Tribunal's evidentiary rulings with some deference, for the type of proof that will be acceptable and the weight it should receive lie largely in the discretion of the [Tribunal].") (internal quotations omitted). Moreover, by design, the expertise of both the Register and the Librarian are applied to the royalty distribution question through their review and approval or rejection of the Panel's proposed settlement of claims and thus the decision that is

ultimately before us for review may fairly be said to be the product of specialized administrative expertise. *Cf. Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.,* 289 U.S. 266, 276, 53 S.Ct. 627, 77 L.Ed. 1166 (1933) ("Dealing with activities admittedly within its regulatory power, the Congress established the commission as its instrumentality to provide continuous and expert supervision and to exercise the administrative judgment essential in applying legislative standards to a host of instances. These standards the Congress prescribed. The powers of the commission were defined, and definition is limitation. Whether the commission applies the legislative standards validly set up, whether it acts within the authority conferred or goes beyond it, whether its proceedings satisfy the pertinent demands of due process, whether, in short, there is compliance with, the legal requirements which fix the province of the commission and govern its actions, are appropriate questions for judicial decision.").

*Cf. Northern Pac. Ry. v. Department of Pub. Works*, 268 U.S. 39, 44–45, 45 S.Ct. 412, 69 L.Ed. 836 (1925) ("An order based upon a finding made without evidence, . . . or upon a finding made upon evidence which clearly does not support it, . . . is an arbitrary act against which courts afford relief.") (internal citations omitted); *ICC v. Louisville & Nashville R.R.*, 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431 (1913) ("A finding without evidence is arbitrary and baseless . . . . In the comparatively few cases in which such questions have arisen it has been distinctly recognized that administrative orders, quasi judicial in character, are void if . . . the finding was contrary to the indisputable character of the evidence . . . or if the facts found do not, as a matter of law, support the order made . . . .") (internal quotations and citations omitted); *Concrete Pipe*, 508 U.S. at 623, 113 S.Ct. 2264 ("And application of a reasonableness standard is even more deferential than [clear error review], requiring the reviewer to sustain a finding of fact unless it is so unlikely that no reasonable person would find it to be true, whatever the required degree of proof."); *INS v. Elias–Zacarias*, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) ("To reverse the [Board of Immigration Appeals] finding we must find that the evidence not only supports [a contrary] conclusion, but compels it.").

■ In addition, in reviewing the Panel's proposed settlement according to the "legal" half of the "arbitrary and *legal*" standard of subsection 802(f), we think the Librarian would act in an arbitrary manner if he approved an award proposed by the Panel that unmistakably contravened applicable provisions of Title 17 or if he himself transgressed unequivocal statutory commands. *Cf. Stark v. Wickard*, 321 U.S. 288, 309–10, 64 S.Ct. 559, 88 L.Ed. 733 (1944) ("When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. This permits courts to participate in law enforcement entrusted to administrative bodies only to the extent necessary to protect justiciable individual rights against administrative action fairly beyond the granted powers. The responsibility of determining the limits of stat-

utory grants of authority in such instances is a judicial function entrusted to the courts."); *Chamber of Commerce of United States v. Reich*, 74 F.3d 1322, 1327 (D.C.Cir.1996) (" '[A]cts of all [a government department's] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally grant relief. . . . Otherwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual.' ") (quoting *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, 110, 23 S.Ct. 33, 47 L.Ed. 90 (1902)). Of course, in assessing whether a particular award contravenes provisions of the 1993 Act, the Librarian's interpretation of ambiguous provisions that he is charged with administering is due deference. *See Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."); *NBC*, 848 F.2d at 1296 (finding Tribunal's adoption of presumption, "in the face of congressional silence, . . . a permissible interpretation of the statute, to which we defer" under *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778).

■ Accordingly, if the Librarian's final award to a class claimant bears a rational relationship to the record evidence, is plausibly explained and is otherwise developed in a manner that does not plainly contravene applicable statutory provisions, our task is at an end and we must uphold the award. While we acknowledge the deference that this approach accords to the Librarian's decision is unusually wide, it comports with the unusual character of the cable royalty distribution system that the Congress has devised. *See American Pub. Gas Ass'n v. Federal Power Comm'n*, 567 F.2d 1016, 1031 (D.C.Cir.1977) ("When regulation features novelty, in subject, technique, or both, the narrow scope of review established by conventional doctrine is further circumscribed.").

## III. THE PETITIONERS' CHALLENGES

Applying the arbitrary manner standard of review to the individual claims raised by the petitioners, we conclude that none of them affords a basis for vacating or remanding the Librarian's decision.

### A. Programmer's Claims

Programmer advances three reasons to remand the Librarian's decision: (1) his order did not catenate each award to substantial record evidence and he did not himself explain and assess the basis for each award; (2) he acceded to the Panel's illegal elimination of the "harm" criterion from the royalty apportionment calculus; (3) his order, adopting the Panel's proposed settlement as modified by the Register's recommendation, was arbitrary because it (a) endorsed the Panel's differential treatment of identically situated claimants, (b) did not remedy the Panel's improper reliance on certain evidence to determine JSC's award and (c) ratified the Panel's unduly large award to PBS, failing to take proper account of evidence suggesting a different result. None of these arguments is persuasive.

### (1) Adequacy of Librarian's Order

Programmer's first argument is that the Librarian's order should have discussed the evidence before the Panel and the way in which that evidence ultimately led the Panel, and subsequently the Register and the Librarian, to conclude that each award was appropriate. In other words, it was incumbent on the Librarian to duplicate the work of the Panel and the Register in a final order so that the reasoning underlying a particular award would be less caliginous. See Programmer Br. 6 ("The Librarian's failure to create a complete picture reflects a lack of reasoned decisionmaking."). Although Programmer has not cast its argument in these terms, its claim is essentially twofold: (1) subsection 802(f) required the Librarian to issue an order that fully discussed each stage of the decisionmaking process as well as the evidentiary bases for each of the awards; (2) even if subsection 802(f) did not require this of the Librarian, it was nonetheless arbitrary

for him not to issue such an order on his own. We do not agree.

First, section 802 of Title 17 cannot fairly be understood to oblige the Librarian or the Register to duplicate the work of the Panel. The two-step *Chevron* framework guides our assessment of the Librarian's interpretation:

> Under this analysis, the court must first exhaust the traditional tools of statutory construction to determine whether the Congress has spoken to the precise question at issue.... If the court can determine congressional intent, then that interpretation must be given effect.... If, on the other hand, the statute is silent or ambiguous with respect to the specific issue, then the court will defer to a permissible agency construction of the statute.

*Natural Resources Defense Council, Inc. v. Browner,* 57 F.3d 1122, 1125 (D.C.Cir.1995) (internal citations and quotations omitted).

Under step one of the *Chevron* analysis, we look to the statutory language and structure to determine the Librarian's obligations. *Cf. Steadman,* 450 U.S. at 97, 101 S.Ct. 999 ("The search for congressional intent begins with the language of the statute."). According to subsection 802(e), the Panel is to prepare and forward to the Librarian a "report" that is "accompanied by the written record" and that "sets forth the facts that the arbitration panel found relevant to its determination." Subsection 802(f) does not similarly oblige the Librarian to make a report of his findings. *See* 17 U.S.C. § 802(f), quoted *supra.* Indeed, the statute gives the Librarian only 60 days to review the Panel's report and within that time period he must adopt the proposed settlement unless he finds it arbitrary or illegal. *Id.* If he rejects the Panel's proposal, then, without any enlargement of the review period, the Librarian must "issue an *order* setting the ... distribution of fees." *Id.* (emphasis added). In either instance, the Librarian must arrange for *Federal Register* publication of his decision and "the determination of the arbitration panel" and he must also make available for public inspection and duplication the Panel's report and the record accompanying it. *Id.*

In view of these statutory requirements, we cannot conclude that the Librarian is required by subsection 802(f) to issue an order fully recapitulating the work of the Register and the Panel. Had this been the Congress's intent, there would have been no need to require the Librarian to make available the Panel's report and accompanying record, and according to well-established principles of statutory construction, we do not read subsection 802(f) in a manner that renders superfluous the final sentence of that provision. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").

Moreover, we find nothing unreasonable or impermissible about the Librarian's understanding of his obligations under subsection 802(f). *Cf. NAB I*, 675 F.2d at 376 ("The Tribunal was free to structure its proceedings in a reasonable fashion, ... and deference is particularly due where courts review statutory interpretations by the agency charged with the responsibility of setting [the] machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."). Indeed, the virtues of the Librarian's interpretation are obvious: it avoids duplication of effort and better enables him to conclude his responsibilities within the 60 days subsection 802(g) allots for his review and (if necessary) modification of the Panel's proposed settlement. *See Puerto Rico Maritime Shipping Auth. v.*

*Federal Maritime Comm'n,* 678 F.2d 327, 352 (D.C.Cir.1982) ("The Commission's Order, coupled with the ALJ's opinion, adequately informs us of its findings and its reasoning. In the context of these expedited proceedings, we ask no more.").

■ Second, under the standard of review articulated in Part II, *supra,* we find nothing in the Librarian's decision to adopt the Panel's proposed settlement, as modified in certain particulars by the Register's recommendation, that suggests he discharged his review obligations in an arbitrary manner. *See CBN,* 720 F.2d at 1304 ("Accordingly, as we stated in [*NAB I*], the Tribunal's findings will be upheld, though of less than ideal clarity, if the path which the agency follows can reasonably be discerned.") (internal citations and quotations omitted); *id.* at 1306 ("It is well established that an agency may explain itself by incorporating by reference parts of the record....").[14]

### (2). Elimination of Harm Criterion

■ Programmer next argues that the Librarian acted in an arbitrary manner in approving the Panel's conclusion that the harm criterion is not a useful means by which to assess the merits of a class claim.[15] This argument, like the preceding one, has two parts: (1) the Panel violated subsection 802(c) and the Librarian did not take appropriate corrective action; (2) the Panel did not sufficiently explain or support by reference to the record evidence its decision to elimi-

---

**14.** Contrary to Programmer's suggestion, we find nothing improper in the Register's submission of questions to the Panel to clarify its reasons for proposing a particular award. As with the Librarian's decision, subsection 802(f) does not elaborate on the content of the Register's recommendation to the Librarian. In the face of such legislative silence, *Chevron* deference is due the Register's interpretation, which is plainly not unreasonable. Further, to the extent Programmer suggests that the Register's "remand" to the Panel impermissibly lengthened the Librarian's review period and that the Librarian's decision should be set aside on this basis, we disagree. Even if correct, a missed deadline in a case such as this cannot justify invalidation of the Librarian's decision. *See NCT,* 724 F.2d at 189 n. 23 ("It would be irrational and wholly unprecedented for a court to direct an agency to scrap a year's hearings and decisionmaking effort and

start over because its proceeding did not conclude precisely on time.").

**15.** The Register's recommendation, adopted by the Librarian, described the Panel's rejection of the harm criterion as follows:

It is clear from the Panel's answer [to certified questions about the harm criterion] that, rather than treating all parties as equally harmed and awarding equal shares of harm credit, the Panel effectively determined that the harm criterion was a complete nonfactor. The panel did not consider harm to be of any value in determining the distribution percentages, instead it emphasized the marketplace value criteria. As a result, all parties received a zero credit for harm, and the evidence presented by the parties regarding this factor was given no weight.

Librarian Decision, 61 Fed.Reg. at 55,658.

nate the harm criterion and the Librarian did not remedy the deficiency. The argument is meritless.

Contrary to Programmer's contentions, our past decisions make clear that the Congress delegated to the Tribunal (and now to the Librarian, the Register and the Panel) responsibility for developing the criteria by which claims are to be assessed. *See NAB I,* 675 F.2d at 376 ("The Act explicitly contemplates that the *Tribunal* will announce its decisional criteria in the 'final determination.'") (emphasis added); *CBN,* 720 F.2d at 1313 ("In light of Congress' evident intent to leave the development of 'particular, limiting standards for distribution' to the *Tribunal,* ... we have affirmed the Tribunal's five allocative factors as a reasonable interpretation of legislation by the agency charged by Congress with its enforcement.") (emphasis added); 1976 House Report at 97.

Moreover, we can find nothing in the language, structure or history of subsection 802(c) that evinces any intent to rescind the former delegation of authority to determine the appropriate criteria by which to gauge distribution claims. Subsection 802(c) merely states that "arbitration panels *shall act on the basis of* a fully documented written record, prior decisions of the Copyright Tribunal, prior copyright arbitration panel determinations, and rulings by the Librarian of Congress under subsection 801(c)."[16] 17 U.S.C. § 802(c) (emphasis added). Similarly, while the ad hoc panel is now the initial factfinder, its decision is subject to scrutiny by both the Register and the Librarian and, if the latter do not concur in the panel's rejection of prior Tribunal practice, they may force compliance with that practice. *See, e.g.,* Librarian Decision, 61 Fed.Reg. at 55,661 (concluding that Panel should have adhered to Tribunal practice of setting final percentage awards on basis of awards to all classes, regardless whether class settled its claims or litigated them before Panel). This arrangement also dovetails with the Librarian's obligations under the arbitrary and legal review standard of subsection 802(f) as well as his authority, pursuant to subsection 801(c), to issue orders establishing the procedures the Panel and claimants are to follow. Accordingly, we defer to the Librarian's reasonable and permissible interpretation of the requirements of subsection 802(c) under the second step of the *Chevron* analysis.[17]

Nor has Programmer given us any basis to conclude that the Librarian "acted in an arbitrary manner" in finding that the Panel's elimination of the harm criterion was neither arbitrary nor contrary to applicable law. The policy reasons Programmer advances to support retaining the harm criterion are misdirected; those are matters for the Librarian and his agents, not this Court. *Cf. NAB II,* 772 F.2d at 940. Similarly, the Panel's explanation for jettisoning the harm criterion, as refined by the Register's recommendation and the Librarian's decision, is more than adequate to survive scrutiny under the arbitrary manner standard; the Panel explained that the harm criterion was in fact simply a different expression of diminution in market value and that the evidence did not provide for any meaningful way to distinguish among the parties.[18] No more was required of the

---

**16.** Subsection 801(c) provides:
> The Librarian of Congress, upon the recommendation of the Register of Copyrights, may, before a copyright arbitration royalty panel is convened, make any necessary procedural or evidentiary rulings that would apply to the proceedings conducted by such panel.

17 U.S.C. § 801(c).

**17.** Accordingly, we also defer to the Librarian's and the Panel's reasonable interpretation of the "harm" criterion as applied by the Tribunal in the past.

**18.** The Panel responded to the Register's certified questions regarding the harm criterion as follows:

> [T]he panel found that evidence of harm was not quantifiable and did not establish that any one party was entitled to a harm credit more than any other party. Other than identifying that a claimant whose program was transmitted without compensation has been harmed, it did not lend any appreciable information on relative market value. At least two expert witnesses testified that "harm" is merely another way of describing, or an aspect of, the supply side of the market, just as "benefit" is another way of describing, or an aspect of, the buyer's side of the market.

Panel Responses to Certified Questions at 4; *accord* Panel Report at 20–25 (concluding that "'market value' is the only logical and legal

Panel or of the Librarian in adopting the Panel's conclusion. Thus, having properly rejected the utility of such evidence, neither the Panel nor the Librarian was obliged to go further.

### (3) Panel's Evidentiary Findings

 Finally, Programmer claims that the Librarian acted in an arbitrary manner by approving the Panel's proposed awards as adjusted by the Register's recommendation even though the Panel (1) did not evaluate market value according to a uniform set of criteria with respect to the Devotional and NAB awards, (2) did not accord similar weight to comparable evidence with respect to the JSC award and (3) did not consider some evidence that plainly detracted from its conclusions with respect to the PBS award.[19] However, none of the asserted errors provides a basis for adjusting *Programmer's* award. Even if the awards to Devotional, NAB, JSC and PBS were arbitrary, Programmer does not explain how correcting the errors would benefit it. Indeed, to the extent Programmer's first claim suggests that Devotional's claim was undervalued, success on the claim could threaten only to reduce the Programmer award. Accordingly, because subsection 802(g) grants an appeal only to an "aggrieved party," and because Programmer has failed to show how it has been aggrieved by the Panel's allegedly arbitrary evidentiary findings regarding other classes' awards, we cannot hear the claims. *See Asociacion de Compositores y Editores de Musica Latinoamericana v. Copyright Royalty Tribunal,* 809 F.2d 926, 928 (D.C.Cir.1987) ("ACEMLA, however, is not aggrieved by the award to LAMCO. The two are, for our

purposes, separate entities; ACEMLA thus has no statutory basis to challenge that portion of the [Tribunal's] decision that affects LAMCO.").

### B. Devotional's Claims

Devotional requests that we adjust its award upward to correct for four errors that the Librarian allegedly made in approving Devotional's award, as it was adjusted by the Register's recommendation: (1) the Librarian failed to independently examine the record and make his own determination as to the appropriate share of the royalty funds to which each class was entitled; (2) the Panel awarded Devotional a share of the royalties that was nominally the same as its share of the 1989 funds, but the Librarian, without any evidentiary basis for his decision, adjusted downward the Panel's proposed award to account for certain settlements the Panel overlooked in its calculations; (3) the Librarian ratified the Panel's arbitrary failure to increase the Devotional's share as a result of the elimination of the harm criterion; (4) the Librarian acceded to the Panel's arbitrary failure to accord Devotional's viewership surveys and testimonial evidence the same weight as it gave other claimants' evidence of this kind. None of these claims warrants vacating or remanding Devotional's award.

### (1) Librarian's Order

 Devotional's first argument fails for the same reasons Programmer's similar argument failed. As discussed above, subsection 802(f) cannot reasonably be construed to require the Librarian to duplicate the

---

touchstone" by which to assess the merits of various class claims).

19. To the extent Programmer claims that subsection 802(f) allows the Librarian only two choices—adoption or rejection of the Panel's report *in toto*—we find nothing in the language of the provision that requires that interpretation and thus we accord the Librarian's reasonable interpretation deference under *Chevron. Cf. NBC,* 848 F.2d at 1296 ("This presumption by the [Tribunal], in the face of congressional silence, is a permissible interpretation of the statute, to which we defer."). Further, we think it plain from the Librarian's order that the Register (and thus the Librarian) adopted the Panel's pro-

posed settlement, except for the technical adjustments the Register recommended. *See* Librarian Decision, 61 Fed.Reg. at 55,653 ("The Librarian is adopting in part and rejecting in part the decision of the Copyright Arbitration Royalty Panel (CARP). The rejection takes the form of making some adjustments to the distribution percentages."); *id.* at 55,669 ("[T]he Librarian of Congress fully endorses and adopts her [the Register's] recommendation to accept the Panel's decision in part and reject it in part. For the reasons stated in the Register's recommendation, the Librarian is exercising his authority under 17 U.S.C. § 802(f) and is issuing an order setting the distribution of cable royalty fees.").

efforts of the Panel and the Register; here the path of decisionmaking is reasonably transparent and there is nothing unreasonable in the Librarian's decision to issue an order that addresses only the specific problems the Register (and thus the Librarian) identified in the original Panel report. *See supra* Part III.A.(1).[20]

### (2) Librarian's Explanation of Adjustment

■ The contention that neither the Librarian nor the Panel articulated a rational reason for reducing Devotional's award is also without merit. The Panel erroneously predicated its proposed settlement on the assumption that 100% of the royalty funds collected for 1990–1992 were in dispute. *See* Panel Responses to Certified Questions at 3–5 (acknowledging that Panel did not adjust proposed awards for NPR settlement and that award to Devotional was "based on a 100% scale"). Consistent with the Register's recommendation, the Librarian corrected this mistaken assumption by adjusting all of the class awards by an appropriate percentage to account for the settlement of certain claims. *See* Librarian Decision, 61 Fed.Reg. at 55,661. As a result, Devotional's final share of the royalty funds was slightly lower than its share of the 1989 funds. *Compare* Table 2 *with* Table 3. Specifically, the relative difference between the Panel's proposed award and the Librarian's final award was on the order of 5.62% for the Basic Funds and 4.275% for the 3.75 Fund, corresponding to an absolute difference of 0.06 and 0.04 percentage points, respectively.

Devotional argues that because the Panel found that its circumstances had not changed, the Panel intended to award Devotional the same amount that it received in the earlier distribution (after the settlements). Because the earlier amount was a *post-ad-*

*justment* figure, it seems to be arguing that the Librarian should not have reduced its award in adjusting for the Panel's omission of the settlement. In Devotional's view, the reduction gave it a post-adjustment award lower than its earlier award and this lower award does not make sense in light of its unchanged circumstances. (Its argument implies that it would be happy if the Librarian had acknowledged the settlement by adjusting every other party's award, but not its.)

Even if Devotional were correct that the Panel intended to award it the same percentage it received in the earlier distribution, we are reviewing the Librarian's decision, not the Panel's. The Librarian's method of correcting the Panel's mistake was neither arbitrary nor irrational. The Librarian understood the arguments made by each party and explained why he did not accept the Panel's original judgment. In making his ultimate decision, he made a reasonable judgment that it was not necessary to reconsider the relative entitlements of each party in order to correct the Panel's mistake. We need not decide whether the Panel had intended to give Devotional a post-adjustment award equal to its earlier award because the Librarian's final figure is only slightly changed from the earlier one and remains within the zone of reasonableness. *See NCT,* 724 F.2d at 182 ("There has never been any pretense that the [Tribunal's] rulings rest on precise mathematical calculations; it suffices that they lie within a zone of reasonableness."); *NAB I,* 675 F.2d at 379 (rejecting arguments regarding quantitatively *de minimis* interests).

### (3) Elimination of Harm Criterion

■ Devotional next argues that elimination of the harm criterion should have result-

---

**20.** Nor is the mere fact that Devotional's award represented a compromise between differing expert views of the value of its programming a sufficient basis for finding the compromise figure arbitrary. *See NAB II,* 772 F.2d at 940 (observing that percentage awards are "inherently subjective judgment calls" and require "rough balancing of hotly competing claims"); *NCT,* 724 F.2d at 187 ("In essence, it appears that the [Tribunal] attempted to 'split the difference.' We

have upheld similar exercises of the [Tribunal's] expert judgment before."). Moreover, the suggestion that the Panel's process fell below minimum constitutional requirements of the Due Process Clause is specious. *Cf. NAB I,* 675 F.2d at 376 ("Neither the Act nor the requirements of the due process were violated by the Tribunal conducting that apportionment with the openmindedness that should accompany the performance of any task for the first time.").

ed in an enlargement of its award. This argument is also meritless. The harm criterion was but one factor in the Tribunal's five-factor distribution calculus. *See supra* Part I.A. Thus, the Panel's elimination of a single factor hardly compels a particular adjustment to a class's award based on the benefit or detriment the class may have derived from the factor in the past. Indeed, while the Panel eliminated the harm criterion, it also increased the weight given to the marketplace value criterion, *see* Panel Report at 23. The effect of eliminating the harm factor is therefore indeterminate; without knowing the relative magnitude of the change according to each factor and whether any of the assessments of other factors changed, it is well nigh impossible to predict what effect the elimination of the harm factor might have on a final award. *Cf. NAB II,* 772 F.2d at 935 ("Thus the issue is not whether the Canadians objectively improved the quality of their evidentiary submissions, but rather whether any such improvement was sufficient to warrant an award from the 1980 fund greater than the 1979 award, *in light of the submissions made by other claimants.*") (emphasis added). Accordingly, the fact that Devotional's award did not increase as a result of the elimination of the harm criterion does not suggest arbitrary action by either the Panel or the Librarian.

Moreover, the fact that the Panel found that Devotional's circumstances had not changed since the distribution of 1989 funds does not require a different conclusion. As in past distribution proceedings, the "changed circumstances" inquiry was only one factor influencing the amount of royalties to which a class of claimants was deemed entitled and therefore the fact that this variable remained constant is no reason to presume that all other variables did, that other classes' relative shares remained the same or that this factor alone should control a class's award. Indeed, in the past we have explained the significance of the changed circumstances factor in the following manner:

> We agree that, as the parties themselves recognize, *it would be improper, as a matter of law, for the Tribunal to rely solely upon a standard of "changed circumstances."* The invalidity of this rigid ap-

proach is strongly suggested by our two prior opinions, which expressly contemplated that in the annual determination process the claimants would improve upon the quality and sophistication of their evidentiary submissions. At the same time, it is entirely appropriate for the Tribunal to employ, as one of its analytical factors, the determination whether circumstances have changed in the course of the ensuing twelve months, inasmuch as that conclusion will obviously be relevant to the question whether an award should differ from the prior year's award. But if a claimant presents evidence tending to show that past conclusions were incorrect, the Tribunal should either conclude, after evaluation, that the new evidence is unpersuasive or, if the evidence is persuasive and stands unrebutted, adjust the award in accordance with that evidence.

*NAB II,* 772 F.2d at 932 (emphasis added); *accord id.* at 938 (rejecting similar argument that no change in circumstances should have resulted in no change in percentage awarded). We therefore find no reason to set aside the Devotional award.

### (4) Weighing of Evidence

Finally, Devotional suggests that the Panel arbitrarily accorded less weight to some of Devotional's evidence than it accorded to similar evidence introduced by other class claimants. We do not agree. To begin, it is emphatically not our role to independently weigh the evidence or determine the credibility of witnesses—two duties entrusted solely to the Panel and, before it, the Tribunal. *See NAB II,* 772 F.2d at 926 ("[T]he judicial task is not to weigh the evidence and fix what in our view would constitute appropriate percentages."). Further, in view of the exceptionally deferential review we give the Librarian's awards, we can find nothing arbitrary in the Panel's treatment of the evidence to which Devotional refers. The fact that the Panel found that the Nielsen and Bortz survey results reinforced one another with respect to PBS's award but did not increase Devotional's award as a result of increased viewership of Devotional programming does not demonstrate that the Panel

(and subsequently the Librarian) arbitrarily discredited Devotional's evidence.[21] *Cf. NAB I*, 675 F.2d at 381 ("The argument once again comes down to methodology, and the Tribunal's refusal to rely blindly on the data put forward by [a claimant] was not unreasonable. The two approaches lead to a difference of only three percentage points of the Fund, and we cannot say that the Tribunal's choice falls outside a zone of reasonableness."). Moreover, both the cable operator testimony and the survey evidence to which Devotional refers fail to demonstrate that the award the Panel *ultimately* arrived at in each case was arbitrary. Simply because a claimant presented strong evidence of one type does not compel the conclusion that an award based on *all* of the evidence should have been different: the Panel's ultimate decision necessarily rested upon composite judgments as to the overall strength of the evidentiary case submitted in support of and against a class claim. Additionally, with respect to the cable operator testimony Devotional introduced, the Panel found the testimony less compelling than other operator testimony—which was well within its prerogative. *Compare* Panel Report at 130 ("The cable operator's assessment is not supported by any new, persuasive evidence of avidity"), *with id.* at 87–88 (describing JSC's operator testimony, in context of strong statistical and other evidence cumulatively corroborating operator testimony); *accord* Librarian Decision, 61 Fed.Reg. at 55,666 ("When a decision-making body weighs evidence, it may often decide to accept one piece of evidence but reject another, even though they appear similar. *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)."). Accordingly, we find nothing compelling in the evidentiary record nor in the Panel's and the Librarian's assessment of that record that would enable us to conclude that the Librarian acted in an arbitrary manner in fixing Devotional's award. *See* Librarian Decision, 61 Fed.Reg. at 55,666 ("While the Panel's explanation was less than compelling, . . . enough can be gleaned from it to support the conclusion that the Panel rationally weighed the differences in seemingly similar evidence.").

### C. NAB's Claims

 NAB argues that the Librarian acted in an arbitrary manner by failing to adjust its award upward (and Programmer's award downward) for certain categorization errors that were made in compiling the Nielsen results for NAB programming. The argument proceeds from the premise that the Panel, and subsequently the Register and the Librarian, intended to award NAB a percentage of royalties within the range described by the lower bound of its Nielsen survey results. The Panel and the Librarian failed to effect this intent, however, because they relied on incorrect Nielsen numbers in fixing the amount of NAB's award at 7.5% of both the Basic Fund and the 3.75 Fund—the midpoint of the lower range described by NAB's Nielsen numbers, i.e., 7.0% to 8.0%. Instead, NAB contends that the Panel, and subsequently the Librarian, should have adjusted the Nielsen results for certain alleged miscategorization errors involving two programs— "National Geographic Explorer," a NAB program, and "National Geographic on Assignment," a Programmer program—resulting in a larger award to NAB. We can find nothing in these claims to suggest that the Librarian "acted in an arbitrary manner" in declining to adjust the NAB award.

**21.** The Nielsen and Bortz surveys were the principal and most important statistical evidence before the Panel. *See* Panel Report at 27–66. The Nielsen survey assesses the percentage of viewers each type of programming attracts whereas the Bortz survey calculates the value of the types of programming to cable transmitters—which does not correlate perfectly to shares of viewers because cable companies may be more interested in acquiring certain kinds of programming to diversify their offerings even though the programming may have a narrower following. *Id.*

In Devotional's case, the uncorrected Bortz numbers show no clear trend: for 1989 cable operators were willing to pay 4.3% of specified funds for the Devotional programming; for 1990 they paid 3.8%; for 1991 they paid 4.3% and for 1992 they paid 3.9%. Similarly, the Nielsen numbers for the same period do not reflect any meaningful trend: for 1989, the Nielsen number was 0.22% of viewers according to the survey methodology then in use; for 1990 the number, using a different methodology, was 1.0%; for 1991, the number was less than 1.0%; for 1992, the number was once again 1.00%.

To begin, because it is the Librarian's decision which is directly before us on review, not the Panel's, the Librarian's understanding of the Panel's intent with respect to a particular award is controlling unless patently implausible on the record before him. Here, it is plain that neither the Librarian nor the Panel intended to make the Nielsen results the sole determinant of NAB's share of the royalty funds. *See* Librarian Decision, 61 Fed.Reg. at 55,665 ("The Panel has clarified that it did not intend to award NAB its Nielsen viewing share, but was only using those numbers as a reference point for determining the award."). As a result, even if NAB is correct on its miscategorization claim, the claim fails to provide a basis for setting aside the award; the adjusted Nielsen figures were but one item of evidence that supported the Panel's calculation of fair market value of the programming, the "only logical and legal touchstone" for apportioning royalties. Panel Report at 23; *accord* Panel Responses to Certified Questions at 4 ("It was the Panel's assessment that 7.5% was the fair market value of [NAB] programming."); Panel Report at 44 ("We cannot quantify the Nielsen statistics as evidence of market value other than to say that actual viewing is very significant *when weighed with all other factors.*") (emphasis added).

Moreover, even if the Panel and the Librarian had intended to tie the NAB award to the lower limits of its Nielsen viewing share, we find nothing arbitrary in the Panel's and the Librarian's successive refusals to correct the Nielsen numbers.[22] It was well within the Panel's prerogative to weigh the miscategorization evidence and other testimony and conclude that, given the fact the Nielsen results were at best an imperfect proxy for market value, it did not make sense to attempt to refine the figures:

> Dr. Peter Miller, in testifying for the JSC, says the Nielsen figures should be looked at with some degree of caution. He says the numbers could be biased in one direction or another but that this cannot be quantified and that we should take those numbers with "a grain of salt." We do accept those numbers in that vein. We see no need to engage in a lengthy discussion about the Nielsen methodology in light of the fact that we accept these numbers merely as a reference point and not as an absolute value. Also, in addition to being unable to quantify their various criticisms, the claimants who dispute the Nielsen survey's accuracy present no alternative evidence as to viewing.
>
> The next question is, what do these numbers reveal about market value? Program Suppliers acknowledge that the Nielsen study does not measure value; rather, it measures tuning. Program Suppliers point out they did not ask Nielsen to interpret what the results meant, but left that to the other witnesses and the evidence. Program Suppliers agree that the Nielsen figures are not the sole determinant of market value.

Panel Report at 43; *cf. NCT,* 724 F.2d at 187 ("In sum, the Tribunal sought to estimate a market price in the absence of a functioning market. It used the best, indeed, the only, analogies available to it. It could not mathematically derive its ultimate decision. Inevitably, it used its expert judgment to make a 'best guess'; we are not positioned to offer a better one."). We believe this judgment to be an eminently reasonable one and it is far from the type of disconnect between the evidence and the award that could warrant our intervention under the "arbitrary manner" standard of subsection 802(g). *Cf. Association of Am. Publishers, Inc. v. Governors of United States Postal Serv.,* 485 F.2d 768, 773 (D.C.Cir.1973) ("It would, of course, be the *summum bonum* if we had accurate figures as to recent costs of carrying special fourth class mail. The only available figures were inaccurate, but were susceptible of rough adjustment. The Postal Service proposed one method of adjustment; the Chief Examiner, another. So the Commission more or less split the difference. No doubt it

---

**22.** We reject any suggestion by NAB that the Panel was obligated to correct the Nielsen figures simply because the Tribunal had undertaken such a task in the past. Just as the Panel was authorized to dispense with the harm criterion because it found the criterion unhelpful, it was not required to follow the Tribunal's lead on the miscategorization errors given its assessment of the imprecision of the evidence. *See supra* discussion, Part III.A(2).

would have been possible to straighten out some of the errors or supposed errors of adjustment in either the Postal Service's or the Chief Examiner's calculations. And if rate-making [or royalty distribution] were an exact science such a counsel of perfection would be mandatory. But, though courts hesitate to so admit, they know that in the rate-making area, John Selden was prophetic in declaring that in governing it is not juggling, but too much juggling that is to be blamed.").

## IV. CONCLUSION

In summary, we conclude that the Copyright Tribunal Reform Act of 1993 significantly narrowed the standard of review applicable to the Librarian's apportionment of cable royalties. Under the applicable standard, we find nothing in any of the petitioners' claims that warrants modification or remand of the Librarian's Phase I awards. Accordingly, the petitions for review of the decision of the Librarian, as reported in Distribution of 1990, 1991 and 1992 Cable Royalties, 61 Fed.Reg. 55,653 (1996), are

*Denied.*